O. and J. KANE *against* BLOODGOOD and others.

The statute of limitations is a good plea in equity, as well as at law.

Those *trusts* which are mere creatures of a Court of equity, and not within the cognizance of a Court of law, are not within the statute of limitations. As long as there is a continuing and subsisting trust, acknowledged or acted on by the parties, the statute does not apply ; but if the trustee denies the right of his *cestui que trust*, and the possession of the property becomes *adverse*, lapse of time, from that period, may constitute a bar in equity : but other trusts, which are the ground of an action at law, are not exempted from the operation of the statute.

Where the plaintiff is entitled to dividends on shares, in an incorporated company, and for which he has a clear remedy at law, it is not such an express and direct trust, as will take the case out of the statute.

*February 28th.*  ON a rehearing. The bill, filed *July* 5th, 1821, stated, that an act was passed, *March* 30th, 1797, incorporating *the Hamilton Manufacturing Society ;* and that, by an act of the 28th of *March,* 1809, its duration was extended to the 1st of *March,* 1821.  That on the 1st of *April,* 1797, the stock of the society consisted of 41 shares, at 1000 dollars each ; that *Leonard Gansevoort* then owned one share, worth 1000 dollars, and, afterwards, on the 10th of *September,* 1804, being entitled to six other shares, he assigned, for a valuable consideration, all the seven shares to *J. & A. Kane,* with all the profits arising therefrom, from the 1st of *May,* 1804.  That the assignment was

under the hand and seal of *L. G.*, and endorsed on the certificates of the shares held by him, under the seal of the society. That the certificates and assignments thereof were delivered by *J. & A. K.*, to the society, who retained them; and, on the 9th of *October*, 1804, gave new certificates under their seal for the six shares; " thus recognising the right of *J. & A. K.*, to the shares and the profits thereon, from the 1st of *May*, 1804." That the society, notwithstanding they became *trustees* to *J. & A. K.*, for the profits on the shares as aforesaid, neglected and refused to pay the profits on the seven shares, from the 1st of *May*, to the 9th of *October*, 1804, amounting to 565 dollars and 52 cents, though the same were frequently demanded of the society, and of their factor, *G. Pearson*, under the false and fraudulent pretence, that the profits had been carried to the account of *L. G.*, with the society, and that on such account, he was, on the first of *October*, 1804, indebted to the society beyond the amount of the profits. That the account of *L. G.*, with the factor, (who received all the rents and profits, and kept all the accounts with the stockholders, and paid them their dividends, under the authority of the society,) stood in his books, on the 9th of *October*, 1804, with a credit of dividends, to the 1st of *May*, 1804, and a balance due the society, of 867 dollars and 79 cents, for glass. That the credits for those dividends, were for dividends or profits due *L. G.*, on the seven shares. That the further dividends on the seven shares, from the 1st of *May*, to the 9th of *October*, 1804, were actually credited to *L. G.*, in the books of the factor, to the exact amount of 565 dollars and 52 cents, notwithstanding the assignment of the shares, and the new certificates as above stated. That these dividends were declared, or sanctioned, or authorized by the society, or the directors. That there never was any actual payments of the last mentioned dividends to *L. G.*, and the society, notwithstanding their false and fraudulent pretence aforesaid, received and held the same,

in trust for *J. & A. K.*, and are now liable to account for the same, with interest. That they have not paid the same, under the false and fraudulent pretence of their having accounted for the same with *L. G.*

That *James Kane*, as the survivor of *J. & A. K.*, on the 5th of *July*, 1819, assigned to the plaintiff, *Oliver Kane*, all the said claim to the said dividends, on the said seven shares, from the 1st of *May*, to the 9th of *October*, 1804.

That the society, by their certificate, under their seal, dated *May* 26th, 1797, distinguished by No. 41, certified, that *L. G.* owned one share of the stock, which certificate, *L. G.*, by an endorsement thereon, on the 10th of *September*, 1804, assigned to *J. & A. K.*, with all the profits arising thereon, from the 1st of *May*, 1804; which certificate, with the assignment, they afterwards delivered, with the other six certificates, to the factor of the society, who gave new certificates for the six shares, but delayed to give a new certificate for the share, No. 41, or to pay the profits thereon, until the 16th of *November*, 1804, when *J. & A. K.* demanded a new certificate, and payment of the profits, which were refused, until a debt alleged to be due from *L. G.*, on the share, to the factor, was paid; and the directors passed a resolution, that the certificate, No. 41, should be retained, and no certificate issued in lieu thereof, until the sum due thereon from *L. G.*, was paid, with interest; and that the factor should not pay to *L. G.*, or his assigns, any dividend due, or to become due, until payment should be made of such debt, and interest; and, under this pretence, the certificate for the stock, and the payment of the dividends thereon, from the 1st of *May*, 1804, were unjustly and fraudulently withheld, though repeatedly demanded. That *L. G.* was a man of large fortune, and the society held his note or notes, dated *May* 1st, 1797, for 900 dollars, for the said share, the payment of which, with interest, might have been en-

forced, or the profits have been retained. That the society, after notice of the assignment of the seven shares, and the profits thereof, from the 1st of *May*, 1804, and after their resolution aforesaid, unjustly and fraudulently neglected to retain the profits in their hands, belonging to *L. G.*, sufficient to satisfy the notes aforesaid, and all demands on account of share No. 41 ; but, actually paid to *L. G.*, on the 19th of *November*, 1804, 100 dollars ; on the 27th of *December*, 1804, 500 dollars ; on the 14th of *January*, 1805, 100 dollars ; and on the 14th of *September*, 200 dollars, on account of dividends of stock, declared and due to *L. G.*; and that dividends on each share of stock were declared and paid, or credited on each share of stock, half yearly, from the 1st of *November*, 1804, to the 15th of *May*, 1813, which were specified ; and that *J. & A. K.* were entitled to receive the like dividends on share No. 41 ; but the same, though demanded, were unjustly and fraudulently refused, under the false and fraudulent pretences aforesaid.

The plaintiffs claimed the dividends on share No. 41, from the 1st of *May*, 1804, to the 15th of *May*, 1813, amounting to 1165 dollars, with interest thereon, and the 565 dollars and 52 cents, being the dividends on the seven shares, from the 1st of *May*, to the 9th of *October*, 1804, with interest ; and they averred, that the plaintiff, *O. K.*, gave notice to the society of the amount and demand, on the 3d of *November*, 1820. That none of the profits or dividends on share No. 41, from the 1st of *May*, 1804, were allowed, or credited, or paid to *L. G.*, in his lifetime, before the transfer of his seven shares. That *J. K.* had, on the 1st of *July*, 1819, a just claim on the society, for cash advanced for and in behalf of the society, between the 1st of *May*, 1808, and the 15th of *October*, 1814, of 6209 dollars and 43 cents, and he, therefore, gave credit, on the 29th of *September*, 1814, by *L. L. Van Kleeck's* note, for 188 dollars.

That the corporation, on the 2d of *August*, 1805, filed a bill against *L. G.* and others, in which issue was joined, and an order of reference made, when *L. G.* died; and the suit was revived against his representatives; and on the 24th of *July*, 1820, a decree was made, that the executor of *L. G.* should pay to the company 10,713 dollars and 54 cents, with interest from the 6th of *April*, 1820. That the company, on the reference in the suit, charged the notes above mentioned for 900 dollars, the balance alleged to be due on share No. 41, and interest, which was allowed by the master. That none of the dividends on share No. 41, from 1st of *May*, 1804, were allowed or credited to the executor of *L. G.*; and they had not been paid to *L. G.*, or credited to him before the transfer of the seven shares, which was known to the defendants; and the sum above mentioned, amounting, with interest, to 11,161 dollars and 15 cents, had been paid by the executor of *L. G.* to the defendants.

The defendants jointly put in a *plea* as to a part, and an *answer* to a part. As to so much of the bill as sought a discovery and satisfaction, for or on account of any dividend or profit on *seven* shares assigned, &c. and accruing from the 1st of *May* to the 9th of *October*, 1804; or of any dividends or profits on share No. 41, prior to the 1st of *July*, 1815; or of any *moneys* pretended to have been advanced, &c. for account of the company, or at the request of *J. K.*, as stated in the bill, to amount to 6,209 dollars and 43 cents, they pleaded the statute of limitations; and that the cause of action, if any, arose above six years before the filing the bill, &c.

The defendants, in their answer to the residue of the bill, admitted the act for incorporating the society, &c. They said, that they believed its stock consisted, on the 1st of *April*, 1797, of *forty* shares only; but they did not know who were the owners, or that *L. G.* was entitled to one share. They were informed, and believed, that

by some arrangement between the society and the proprietors of another set of glass-works, the stock was increased to 80 shares, but on what terms or conditions they did not know; that they cannot state the various transfers of stock; that they were informed, and believed, that in 1813 or 1814, *J. K.* presented to the society an account, in which he charged them the value of the share No. 41, and the dividends which accrued on it; and that he was allowed in his account with the society for the same, &c. &c. That they are informed, and believe, that there were large dealings between *J. & A. K.*, and *J. K.* and the society, but cannot find any particular account. That it appears, from the papers found by them, that share No. 41 came to *J. K.* by assignment, and that he assigned it to *A. Warner*, who assigned it to *J. Van Schaick*, whose executors now claim it. That *J. K.* was a director, and continued to hold even until *March*, 1820, &c. &c. That the defendants were elected directors in *March*, 1810, and, by the statute, became trustees, and they referred to schedules of accounts with *L. G.* taken from the books of the society. That, on the 7th of *November*, 1820, they declared a dividend of 165 dollars on each share; and they stated, in a schedule, an account of their receipts and payments. That, from 1807 to 1815, *J. K.* was a director, and took an active part in the management of the concerns of the society. That, pretending to act as president, he sold real estate of the society, &c. &c. That they do not know, nor admit, that the directors held the 565 dollars and 52 cents, stated to have been credited to *L. G.* in trust for *J. & A. K.*; but they alleged, that that sum was payable in glass, and passed to the credit of *L. G.*, &c. &c. They annexed an account with *L. G.*, in which they charged him with glass from 1800 to 1804, and credited dividends to the 9th of *October*, 1804.

*A. Van Vechten,* for the plaintiffs, contended, That all those parts of the bill, to which the statute of limitations was pleaded, were subjects of direct trust, and, therefore, not within the statute, nor any analogous equitable limitation. The act of incorporation created a direct trust, which was to be managed by five directors, for the benefit of the stockholders. The rule is well settled, that, in case of a direct and subsisting trust, a trustee cannot screen himself from accountability to his *cestui que trust,* by a plea of the statute of limitations; and the rule is founded in good sense, and the sound principles of equity. (*Decouche* v. *Savetier,* 3 *Johns. Ch. Rep.* 216. *Cholmondely* v. *Clinton,* 2 *Meriv.* 360. *Lawley* v. *Lawley,* 9 *Mod. Rep.* 32. *Beckford* v. *Wade,* 17 *Vesey,* 96, 97. 1 *Madd. Tr.* 353, 354. 359, 360. *Lechmere* v. *Carlisle,* 3 *P. Wms.* 222.) There are cases of trusts raised by implication of law, from matters of evidence, and for the sake of the remedy, and not resting upon any direct agreement between the parties, to which the statute of limitations has been held applicable; because there is no abiding relation of trustee and *cestui que trust,* in such case, by mutual agreement of the parties. It cannot be pretended, that the statute of limitations is not pleadable by a corporation, when sued on a contract; but in a case of direct trust between a corporation and its directors, as trustees, and a *cestui que trust,* while the trust is subsisting, such a plea is not allowable. The Chancellor, in stating the reasons of his decree, assumed that the plaintiffs, by their bill, admit that the Messrs. *Kanes* had a legal remedy to recover the dividends in question; and, by neglecting to pursue the remedy within six years, the statute is a bar to the relief now sought in equity. But, if this is clearly a case of a direct trust, the principle is settled, that the statute cannot apply; and it is perfectly immaterial, whether the Messrs. *Kanes* had a legal remedy or not. If, however, the plaintiffs have, under a mistake as

to the law, admitted there was a legal remedy, they ought
not to be concluded by it. The dividends consisted of
dividends which had accrued before the Messrs. *Kanes*
became owners of the stock; and must have accrued to
the use of the former owners. There was no perfect legal
assignment of the share No. 41. The new certificates,
issued on the 9th of *October*, gave them no legal right
to profits which had antecedently accrued. It is
enough, we contend, if the remedy at law was doubtful;
for equity will not, in such a case, allow the statute to be
a bar.

Again; the defendants, under the act giving relief
to creditors of corporations, created by any law of the
state, having, upon the dissolution of this society, be-
come trustees of that corporation, are bound to pay the
debts due and owing by the corporation, as far as the
moneys and property belonging to the corporation
enable them to do, without any discrimination; and the
statute is not, therefore, a bar to the debt of 6,209 dollars
and 43 cents, claimed by the bill.

*H. Bleecker*, for the defendants, contended, that this
case did not present such a *trust* as could be exempted
from the operation of the statute of limitations. The rule
is clearly laid down in *Sturt* v. *Mellish*, (2 *Atk.* 610,)
where Lord *Hardwicke* said, " I agree, that if it is a trust,
it would not be within the statute; but there is no colour
to call it so here; for a *trust is such a confidence* be-
tween the parties, that no action at law will lie, but is
merely a case for the consideration of this Court; and
every bailment might as well be said to be a trust as this."
This rule is plain and easy in its application, and sa-
lutary in its operation. If any other cases of trust, but
those in which there is no remedy at law, are exempt from
the operation of the statute, the wise policy of that statute
must be, in a great degree, defeated. The numerous

1823.

KANE
v.
BLOODGOOD.

transactions of men which come under the notion of a *trust,* in the large sense of the word, and the great variety of cases which, as matter of *trust,* are subject to the very extensive jurisdiction of this Court, would, if every matter that can be called a trust be exempt from the statute, be kept out of the Courts of law ; and it would be necessary to change the forum, and substitute a bill in equity, for an action of account, assumpsit, trover, or detinue, and thus render the statute a dead letter. All the varieties of bailments, loans, pawns, deposits, &c. would, as cases of direct and subsisting trusts, be placed beyond the reach of the statute. The true distinction is, that a trust, not subject to the statute of limitations, is, " that creature of a Court of equity, of which the common law takes no notice, and over which Courts of equity have an original, peculiar, and exclusive jurisdiction." (1 *Madd. Tr.* 359.) This is the rule fairly to be deduced from the decisions of the English Court of Chancery. (1 *Bro.* 554. *App.* 15 *Vin.* 125. *Limitation* T. 2 *Vent.* 345. 2 *Madd. Tr.* 244. 247. 3 *P. Wms.* 310.) There may be some cases found, which look the other way : but it must be, because the true distinction has not always been regarded. And there can be very little doubt that such cases would now be decided in *England,* according to the rule laid down by Lord *Hardwicke,* in *Sturt* v. *Mellish,* and according to the distinction taken in *Harrison* v. *Lucas,* (1 *Ch. Rep.* 67.) and by Lord *Macclesfield,* in *Lockey* v. *Lockey.* (*Prec. in Ch.* 518.) The modern cases are in precise conformity with this distinction. It is necessary only to refer to the observation of the Master of the Rolls, in *Beckford* v. *Wade,* (17 *Ves.* 87.) and of Lord *Redesdale,* in *Hovenden* v. *Lord Annesly.* (2 *Sch. & Lef.* 630.) The cases cited by the counsel for the plaintiffs, will not, on a careful examination, be found in hostility to this doctrine. The general observations of the Court, in *Decouche* v. *Savetier,* must be understood of those direct and sub-

sisting trusts, which are exclusively cognizable by a Court of equity, and of cases in which there is no remedy at law. That was the case of a legacy. An executor was made a trustee, by the will, to get in the estate, pay the debts, and distribute the surplus. From the nature of the case, there is no fixed time at which the statute is to begin to run. The estate must be settled, and it must be ascertained that there is something for the legatee, before the executor is liable to pay the legacy. Suppose the executor was ready, and offered to pay a legatee, who refused to receive it, would not the statute begin to run from the time of such neglect or refusal of the legatee, and the demand be barred after the lapse of six years? In *England*, an executor cannot plead the statute against a legatee, though he may against a creditor. (10 *Ves.* 93.) Now, is not the executor as much a trustee of a creditor as of a legatee? And is not the trust, if he has assets, as much a direct and subsisting trust, as in the present case? But the creditor may sue at law; the legatee cannot. The time of the executor's liability to the creditor is fixed; it is not so in regard to the legatee. There is nothing in the case of *Harwood* v. *Oglander*, (6 *Ves.* 199. 8 *Ves.*186.) that militates against the doctrine adopted by the Court, in giving the decree in the present case. There is, however, an observation of the Master of the Rolls, that deserves notice. " I should be very sorry," says he, " to have it understood to be the rule of this Court, that there is no limitation whatever to trust estates; and that, let the legal estate once get into a trustee, the *cestui que trust* may permit others to enjoy the property, and come to this Court, at any distance of time, for an account. I do not know that this Court will ever act on so broad a principle." In *Lawley* v. *Lawley*, (9 *Mod.* 33.) the legal estate was in the *trustees ;* and it was, probably, decided on the ground, that it was a strict technical trust, exclusively cognizable in equity ; or the true distinction may have

been overlooked. In *Beckford* v. *Wade*, (17 *Ves.* 96.) the Master of the Rolls, when he says, that " no time bars a direct trust," &c. evidently means to speak of trusts, of which a Court of equity has the exclusive cognizance. The case of *Lockey* v. *Lockey*, supports the doctrine for which we contend. Several cases are put in *Willes's Reports*, (404, 405.) in which there is a remedy both at law and in equity. These are cases of direct and subsisting trusts; but there being a plain remedy at law, they would be subject to the statute of limitations.

But the distinction stated has been distinctly declared by the Court of Errors, in the case of *Murray* v. *Coster*, (20 *Johns. Rep.* 576.) that, to claim exemption from the statute, it must be a *technical trust*, of which a Court of equity has peculiar and exclusive jurisdiction. The only inquiry then, is, whether this is such a trust. The obligation of a bank, or an incorporated manufacturing company, to pay dividends to the stockholders, does not exist alone in a Court of equity, or arise from a strict technical trust. The stockholder is a creditor for the amount of the dividends on his shares, and the directors of the company are his debtors. The remedy at law is plain and perfect. So, in case of a deposit in a bank, there is a direct and subsisting trust; but the depositor is the creditor, and may maintain an action at law for his money. In these, and similar cases, it cannot be maintained that the operation of the statute is excluded on the ground of the trust.

The allegations or facts, stated in the plaintiff's bill, fully show, that *J. & A. Kane* were entitled to the dividends; and that the society, without any right or authority, refused the payment of them. They might have sued for them in their own names; but whether they were obliged to sue, as assignees, in the name of *L. G.*, or not, can make no difference as to the question concerning the plea of the statute of limitations.

Again; to exempt a trust from the operation of the statute of limitations, it must not only be a trust which is the mere creature of a Court of equity; but it must be *express*, or created by deed or will. It is supposed that the trust in the present case is express, because the society is incorporated by statute; but the incorporation is merely for convenience, not for the purpose of creating trusts; nor does it make this a case of an *express* trust in the sense in which that term is used in the books. It is not declared by any formal instrument, bringing the parties to it immediately within the jurisdiction of a Court of equity, but arises, by implication or construction of law, from the acts and situation of the parties. The stockholders choose their directors and agents; but that is not analogous to the case where a trustee is appointed by deed or will. It is no more the case of an express trust, than any other case of principal and agent.

Again; the allegation in the answer, that the defendants believe that the demand of the plaintiffs had been paid or settled, does not overrule, nor is it inconsistent with, the plea of the statute of limitations, which always supposes a payment of the plaintiff's demand, and a loss of the evidence of such payment. Besides, this allegation does not extend to the dividends on share No. 41, nor is the time of its transfer precisely stated.

*Henry*, in reply, said, that the general rule was recognised by the Court, in the case of *Decouche* v. *Savetier*. (3 *Johns. Ch. Rep.* 216.) "All the cases admit, that no time can bar a direct trust, as between trustee and *cestui que trust*." "The settled rule is, (referring to the case of *Cholmondely* v. *Clinton*, 2 *Meriv.* 360.) that so long as a trust subsists, the right of a *cestui que trust* cannot be barred by the length of time during which he has been out of possession, and he can only be barred, by barring and excluding the estate of the trustee."—"This general rule applies to this

case, for the administrator is a trustee for the party enti-
tled by law.   The very office is a trust, and he can take in
no other capacity."   Are not the *Hamilton Manufacturing
Society* and their directors *trustees* for the stockholders?
Can they have any interest in any other character?   It is
not pretended that they have parted with their interest to
any other person.   Again, the Chancellor says, " There is
a class of cases which admit a reasonable time to be a bar ;
but there are cases in which a party is turned into a trus-
tee, by matter of evidence merely, and who took possession
originally in his own right, and was *prima facie* the owner."
Now, has this corporation been turned into trustees by evi-
dence?   Did they ever take, or do they hold, the corpo-
rate property in their own right?   or are they *prima facie*
owners?   Have they not always been trustees by and un-
der the act which gave them existence?   They could not
devest themselves of that character, except by alienation to
a third person, who, coming in as a purchaser, might or
might not be made a trustee by evidence.

Again ; the Chancellor, in the same case, observes, " I
am not prepared to say, that the statute of limitations might
not be set up by the persons to whom the administratrix
bequeathes the trust property, provided sufficient time had
elapsed after her executors or legatees had succeeded to the
possession.   There may, perhaps, be a sufficient analogy
between such a case, and that of the purchasers under the
executors in the cases to which I have referred.   I mean
only to declare, that no time is to be computed against the
plaintiffs, while the administratrix had possession of the
property ; and the subsequent time falls short of any legal
bar."   Have not the directors of this society, the imme-
diate trustees, alone had possession of these dividends? (9
*Mod. Rep.* 92).

This doctrine is fully illustrated and confirmed by Sir
*Wm. Grant*, in *Cholmondely* v. *Clinton*. (2 *Meriv.* 260,
261.)   Nothing can be more applicable than his reasoning

to the present case. The trust not only subsists, but the
directors are to wind up the affairs of the corporation for
the benefit of the stockholders. There is no pretence of a
want of funds. The dividends have been withheld by per-
sons claiming the possession of them as trustees only. In
*Beckford* v. *Wade*, (17 *Vesey* 87. 96, 97.) the defendant
was a fraudulent purchaser from an executrix, a trustee, and
therefore could only be made a trustee by evidence. The
trust was not direct. Mr. *Maddock*, in his treatise, (*p.* 359,
360.) merely defines a trust, and the latter part of his defini-
tion is taken from 2 *Atk.* 612. (*Sturt* v. *Mellish.*) But it
by no means follows, that if, upon direct trusts, there is also
a remedy at law, that they would fall within the statute of
limitations. On the contrary, Lord *Hardwicke* states, that
if a *trust*, the case he had under consideration would not
be within the statute. Suppose, the case of a conveyance of
an estate to sell and account for, and pay over the proceeds to
the grantor, his heirs, &c.; and an express agreement, signed
by the trustee, referring to the conveyance, to act faithfully
and to account; and the estate is sold, and the money re-
tained for more than six years. There would be an un-
questionable remedy at law. But would not this be a
trust, because there is an agreement to account; and would
a Court of equity, notwithstanding the lapse of time, fail to
make the trustee account? Mr. *Maddock*, (*p.* 353, 354.)
states the distinction between express and implied trusts;
but why may not an express trust be created by the pro-
vision of statute, as well as by deed or will? No authori-
ty is cited by him for this distinction; and when he says
express trusts are created by deed or will, he could
not mean to say, that they could be created in no other
way. He observes, "That every *cestui que trust*, whether
a volunteer or not, with or without consideration, is entitled
to the aid of a Court of equity, to avail himself of the
benefit of the trust; and as between the *cestui que trust* and
his trustee, (unless the trustee is such by implication only,)

1823.

KANE
v.
BLOODGOOD.

the statute of limitations does not apply." (1 *Bro. C. C.* 551. 17 *Vesey*, 37.) Whence, then, is the notion derived, that if there is a remedy at law upon a direct, or which is the same thing, upon an express trust, the statute of limitations may be pleaded in equity, between the trustee and *cestui que trust*? The cases referred to in 15 *Vin.* 125. are directly against such a notion.

Suppose *A.*, by writing, acknowledges that he has received from *B.*, *Raphael's* picture of *Paul* preaching at *Athens*, as the property of *C.*, to be delivered to him in six weeks; and upon demand made, seven years afterwards, *B.* should refuse to deliver the picture. An action of trover or detinue might have been brought at law, and would have been barred by the lapse of time. But, if a bill in equity were filed for the delivery of the picture, would the depositary, a mere trustee, not acquiring the possession as a wrong doer, nor as a purchaser, be permitted to say, that, by the lapse of time, the picture had become his?

Bills by legatees, or next of kin, for legacies, or distributive shares, are not, in equity, within the statute; yet, there is a remedy at law, given by statute. (1 *N. R. L.* 314, 315. s. 19, 20.) In *Webster* v. *Webster*, (10 *Ves.* 93.) there was a suit against an executor for a debt. Though Sir *Wm.* Grant (17 *Ves.* 96.) says, " as our statute bars only legal remedies, of course it has no direct operation upon trusts, for which there is no remedy but in Courts of equity," he does not mean to be understood, that where there is a remedy at law, there can be *no trust;* or that the statute will be a bar in equity; for he distinctly asserts, in another place, " that no time bars a direct trust, as between trustee and *cestui que trust*." He means only, that the statute does not apply to trusts which, in their *origin*, were mere creatures of equity. That the language used by Lord *Redesdale*, (2 *Sch. & Lef.* 630.) applies only to constructive trusts, or trusts by implication, is evi-

dent from the instance cited by him, from the case of *Lockey* v. *Lockey*, (*Prec. in Ch.* 518.) of an implied trust in the receiver of the profits of an infant's estate; and where a direct trust, constituted by the act of the parties, is distinguished from it. The case of *Medlicott* v. *O'Donell*, (1 *Ball & Beatty*, 166.) coincides with this distinction; and so do the cases cited from 4 *Bro.* 125. 138. 3 *P. Wms.* 222. In the case of *Wych* v. *The East India Company*, (3 *P. Wms.* 309.) there was a *contract* on the part of the company; they were in no sense trustees, but merely debtors. It might as well be contended, that, in every case of administration or executorship, where the legatees or next of kin were infants, that upon the neglect of the administrator or executor to sue for debts from third persons the statute did not apply.

Again, in regard to the dividends on share No. 41; an offer to account will take a case out of the statute of limitations: (*Earl of Pomfret* v. *Lord Windsor*, 2 *Ves.* 485.) *A fortiori*, must the resolution by the company, in this case, of the 16th *Nov.* 1804, have that effect. The injunction to retain the certificate and dividends, and not to issue a new one, until the sum due on the share, with interest, should be paid, necessarily implied, that when such payment should be made, the right to the share and dividends would become perfect. *J. & A. K.* confided in that implication. The price of the share, with interest, was recovered by the society of the representative of *L. G.*, under the decree of the 24th of *July*, 1820, and, thereupon, the implied engagement of the company became absolute and binding. If this conclusion is not sound, the defendants might as well insist upon length of time, in bar of the right to the share itself. Again; the pleas, as to the dividends on this share, prior to the 1st of *July*, 1815, and as to the dividends on the six shares transferred by *L. G.*, ought not to have been allowed, as the answer alleges facts inconsistent with the plea. The effect of the

1823.

KANE
v.
BLOODGOOD.

1823.

KANE
v.
BLOODGOOD.

statute on the account of *J. K.* against the company, is not adverted to, because, under the leave given to amend, the plaintiffs, whatever may be the decree on the re-hearing, without waving the points urged on the hearing, will state facts relative to that account, sufficient to take it out of the statute.

THE CHANCELLOR. The defendants have pleaded the statute of limitations to so much of the bill as seeks satisfaction for the dividends or profits on seven shares of the stock of the society, assigned by *Leonard Gansevoort* to *J. & A. Kane,* and which accrued between the 1st of *May* and 9th of *October,* 1804 ; and to so much of the bill as seeks satisfaction for the dividends or profits on a share of the said stock, described in the bill as share No. 41, prior to the 1st *July,* 1815, and also to so much of the bill as calls for an account and payment of moneys alleged to have been advanced or paid, laid out or expended, for the use of the society, or at their request, by *J. K.,* between the 1st of *May,* 1808, and the 15th of *October,* 1814.

The cause was set down for hearing, and argued upon the bill and plea ; and on the 16th of *October,* a decretal order was entered, declaring and adjudging the plea to be good and sufficient to so much of the bill as it covered. A rehearing was applied for, in respect to the claim for the dividends, and granted. A revision of the decree allowing the plea, as to the account of *J. K.* against the society for the expenditure of moneys for their use, was not asked for in the petition for a rehearing. 1 had allowed the plea as to that charge, because more than six years had elapsed between the date of the last *item* in the account, and the filing of the bill, and because no admission of the account, or of any part of it, appeared to have been made within the six years, by or under the authority of the society.

The cause has been well and ably argued upon the re-hearing, and I have attentively examined all the authorities

to which I have been referred, or to which I have been directed by my own researches. I have likewise bestowed the best consideration in my power, on the reasoning of the counsel, and the doctrine of the cases, with a view to arrive at a just and satisfactory conclusion.

1. The first point is, as to the dividends or profits on the seven shares, between *May* and *October*, 1804.

The bill charges that *L. G.*, on the 10th of *September*, 1804, owned seven shares of stock of the *Hamilton Manufacturing Society*, and that he then, for a valuable consideration, assigned them to *J. & A. Kane*, with all the profits arising thereon, from the 1st of *May* preceding, by an endorsement on the certificates for those shares, and which certificates were under the corporate seal of the society. The certificates were delivered by *J. & A. Kane* to the society, or to their factor for them, and by them retained; and on the 9th of *October*, 1804, new certificates for six of the shares were given in lieu of the former ones, " thus recognising," as the bill charges, " the right of *J. & A. Kane* to the shares, and to the profits thereon, from the 1st of *May* preceding." The bill further charges, that the society, notwithstanding they became trustees to *J. & A. Kane* for the profits aforesaid, refused to pay the profits arising' on the seven shares between *May* and *October*, though they were frequently demanded of the society and of their factor, and that the refusal was under " the false and fraudulent pretence" that the profits had been carried to the account of *L. G.* with the society and their factor, and that on such account he was indebted to the society, on the 9th of *October*, 1804, beyond these profits.

It is further stated in the bill, that the account of *L. G.* with the factor, (and which factor received the rents and profits due to the society, and kept the accounts of the society, and with the stockholders, and paid them their profits under the direction of the society,) stood on his books of the date of the 9th of *October*, 1804, with a credit of

dividends to 1st of *May*, 1804, and a balance due to the society of 867 dollars and 79 cents for glass, and that the dividends, so credited, had arisen on the seven shares, and been duly declared and authorized to be paid. The further credit which had accrued to *L. G.* for profits on the seven shares, from the 1st of *May* to the 9th of *October*, 1804, amounted to 565 dollars and 52 cents, *and had been actually credited to L. G. on the books of the factor* to that amount, and had been duly declared and authorized to be paid on those shares. But it is averred, that there never had been any actual payment of these dividends so accruing between *May* and *October*, to *L. G.*, and that the society, notwithstanding " the false and fraudulent pretence aforesaid," received and held the same in trust for *J. & A. Kane*, and are now liable to account for the same with all the interest which had accrued thereon. The payment has been withheld under *the false and fraudulent pretence that these profits had been accounted for with L. G.* The bill then states, that the claim to the dividends on the seven shares, from the 1st of *May* to the 9th of *October*, 1804, was duly assigned for a valuable consideration, on the 5th of *July*, 1819, by *J. K.*, survivor of *J. & A. Kane*, to the plaintiff, *O. Kane*, who now claims the same.

These are all the material facts in the bill, respecting that particular claim ; and I cannot consider that claim as being, on the 9th of *October*, 1804, or at any time since, a mere technical trust, the creature of a Court of equity, and cognizable only in equity. The profits on those shares, from the 1st of *May*, passed with the assignment of the shares on the 10th of *September*. They were growing profits, not then ascertained and liquidated or appropriated, and they passed with the shares themselves as incident thereto, not only by the express words, but by the legal operation of the assignments; and the society, by issuing new certificates to *J. & A. Kane*, on the 9th of *October* following, founded upon the assignments, did, in the language of the bill,

An assignment of shares or stock in an incorporated company, passes also the growing profits on such shares; and an action at law to recover such profits after they are ascertained and declared, lies at the suit of the assignee.

recognise their right under the assignments, and which right was just as valid to the intermediate profits, as to the shares to which they were attached. The society, as to those profits, were liable to account to *J. & A. Kane,* as being owners of the stock *before* those profits had been ascertained and declared. An action of account would have lain against the society, in the character of receivers of so much money for the use of *J. & A. Kane.* I apprehend, also, that an action on the case, for so much money had and received to the use of the assignees, would have lain against the society. The pretence that those intermediate profits had been accounted for with *L. G.,* the bill avers to have been a false pretence, and that there never had been any payment of those profits to *L. G.,* and that the society held the same in trust for *J. & A. Kane.* The society had been put in default by a demand and refusal, which is averred. We must assume these allegations of fact in the bill to be just and true; and a plain case of a demand, actionable at common law, is stated in the bill. The facts charged prove the validity and legality of the demand. There is not even colour given by the bill to the inference of any real defence on the part of the society, if an action at law had been brought by *J. & A. Kane* after the 9th of *October,* 1804. If the factor had credited these profits to *L. G.,* he did it without authority from the society, for none is pretended, and *L. G.* had no right to ask, demand, or receive these profits on the face of his assignment. The right of *J. & A. Kane* to these profits was not contingent or executory, but absolute; and from the facts charged in the bill, the conclusion was very properly drawn, that the pretences upon which the society refused to accede to the demand of payment, were false and fraudulent.

But it is quite unnecessary to examine into the merits of the defence which the society might have set up in opposition to the claim of *J. & A. Kane,* in case an action at

law, or in equity, had been brought in due season. It is sufficient, for the purpose of the present inquiry, that the assignees of the stock had a remedy at law for the profits or dividends; and we have no reason to suppose that their legal remedy would not have been as full and effectual, in reference to that specific demand, as a bill in equity; or that the society had the means of making a better defence at law than in equity. What, then, I may be permitted to ask, is to take this part of the demand out of the statute of limitations? The counsel for the plaintiffs contend, that this is the case of a direct or express trust between trustee and *cestui que trust,* and so not within the statute; and they have likewise contended, (though I do not perceive that this point has been pressed upon the rehearing,) that the defendants, upon the dissolution of the corporation, became trustees, by virtue of the act of the 9th of *April,* 1811, (1 *N. R. L.* sess. 34. ch. 235.) and were bound, by the directions of the statute, to pay all the corporate debts, of which this was one.

The objection, that the society held the money in question in the character of trustees, and that this was a trust which, upon equity principles, was not within the statute, has been the main object of discussion in the cause; and there is ground for a good deal of embarrassment in the examination of the question, arising from the loose manner in which the rule is often mentioned in the books, and the want of consistency, as well as precision, in the series of cases applicable to the point.

I cannot assent to the proposition, that all cases of direct and express trust, and arising between trustee and *cestui que trust,* are to be withdrawn from the operation of the statute of limitations, notwithstanding a clear and certain remedy exists at law. The word trust, is often used in a very broad and comprehensive sense  Every deposit is a direct trust. Every person who receives money to be paid to another, or to be applied to a particular purpose

to which he does not apply it, is a trustee, and may be
sued either at law for money had and received, or in
equity, as a trustee, for a breach of trust. (*Willes*, Ch. J., in
*Scott* v. *Surman*, *Willes's Rep.* 404, 405.) The reciprocal
rights and duties founded upon the various species of
bailment, and growing out of those relations, as between
" hirer and letter to hire, borrower and lender, depositary
and person depositing, a commissioner and an employer,
a receiver and a giver in pledge," are all cases of express
and direct trust; and these contracts, as *Sir William Jones*
observes, (*Jones on Bailment*, p. 2.) are " among the prin-
cipal springs and wheels of civil society." Are all such
cases to be taken out of the statute of limitations under the
notion of a trust, when one of the parties selects his remedy
in this Court? A review of the decisions will enable us,
as I apprehend, to deduce from them a safer and sounder
doctrine; and to establish, upon the solid foundations of
authority and policy, this rule, that the trusts intended by
the Courts of equity, not to be reached or affected by the
statute of limitations, are those technical and continuing
trusts which are not at all cognizable at law, but fall
within the proper, peculiar, and exclusive jurisdiction of
this Court.

The earliest case I have met with on the subject, is that
of *Harrison* v. *Lucas*, (1 *Ch. Rep.* 67. 15 *Car.* I.) in
which a plea of the statute of limitations was overruled,
and the Court was of opinion the plaintiff had no re-
medy at law. The case is so briefly stated, that we can-
not attach much weight to it. We do not know even the
cause of action; and it is only to be noted for suggesting
the very distinction taken and acted upon afterwards.
But, in the time of *Charles* II. there were some decisions
which applied the doctrine, that trusts were not within the
statute, to cases that would not now be deemed to warrant
the application.

Thus, in *Heath* v. *Henley*, (1 *Ch. Cas.* 20. 2 *Ch. Rep.* 5.

*margin notes:*

1823.

KANE
v.
BLOODGOOD.

The *trusts*
intended by a
Court of equi-
ty as not to be
reached or af-
fected by the
statute of limi-
tations,    are
those    techni-
cal and con-
tinuing trusts,
which are not
at all cogni-
zable at law.

1823.
KANE
v.
BLOODGOOD.

15 *Car.* II.) the defendant was sued for an account of moneys received by him as a prothonotary of the K. B., for and on behalf of the Ch. J., who was the plaintiff's testator. The plea of the statute of limitations was objected to, on the ground that this was a trust not within the statute, and the defendant was ordered to answer. According to this case, then, every person who receives money to another's use, is a trustee, who is to be placed out of the protection of the statute, if the party elects to sue him in Chancery, instead of suing him at law; but I am persuaded that, upon the authority of the more modern cases, such a proposition cannot be maintained. So, in *Sheldon* v. *Weldman*, (1 *Ch. Cas.* 26. 15 *Car.* II.) the bill was for an account of money delivered by the testator to the defendant to compound for his estate sequestered by government, and the statute was pleaded, and the plea overruled, because the money was delivered on a trust. The same observation will apply to this case; an action at law would lie for money had and received; and if the decision was sound equity doctrine, it would follow, that the party seeking for an account of his money, could, at his pleasure, escape from the bar of the statute, by shifting the suit from one *forum* to another. It would likewise put an end to the well known and vastly convenient and remedial action at law for money had and received, in every case where the demand was of six years standing, and it would go very great lengths towards defeating the policy and provisions of the statute. Again; in Lord *Hollis's* case, (2 *Vent.* 345. 26 *Car.* II.) 100*l.* was lent by his wife, to be disposed of as she should direct; and on a bill for the money, the plea of the statute was overruled, as this was looked upon as a *depositum*, and a trust thereon to the wife. This case, if it were a just authority, would, in a great degree, annihilate the action at law for money lent; and as Lord *Hardwicke* observed, in a case which I shall presently mention, " every bailment might as well be said

to be a trust as this." I have, therefore, no difficulty in disregarding the authority of these few loose and carelessly reported cases in the time of *Charles* II., in which we have only a brief note of the decision, without any reasoning or illustration.

It is well settled, that the statute of limitations is a good plea in equity, as well as at law. This has been the uniformly acknowledged doctrine ever since the statute of *Jac.* I. was enacted. A demand for 2000 pounds was held barred by the statute, as early as 9 *Charles* I., in *Kennedy* v. *Vanlove ;* (1 *Ch. Rep.* 38.) and again, in *Pearson* v. *Pulley*, (1 *Ch. Cas.* 102. 20 *Car.* II.) the Lord Keeper said, he considered 20 years to be a fit time within which a mortgage was to be redeemable, in imitation of the statute of limitations in real actions. So early were the statutes of limitations admitted to be the rule of decision in equity, as well as at law ; and though the Courts of equity were not within the words of the statutes, the time presented by them was adopted by analogy, as a fit and just period for a bar in equity of analogous claims. The great and marked exception to this ordinary application of the statute to equity cases, exists in the matter of trusts falling exclusively within equity jurisdiction.

*The statute of limitations is a good plea in equity as well as at law.*

The first case that gave any thing like precision to the definition of a trust, not affected by the statutes, was that of *Lockey* v. *Lockey*, decided by Lord *Macclesfield*, in 1719. (*Prec. in Ch.* 518.) That was a bill for an account of the profits of an estate received while the plaintiff was an infant, and the bill was not filed until six years after he came of age. The case does not state the exact character and relation of the defendant ; though I should infer, from one part of the case, that the defendant had been in possession, and received the profits, not as a tort-feasor, but under an *agreement*, constituting him a trustee for the infant. The Lord Chancellor was clearly of opinion, " that where one *receives the profits of an infant's estate*,

and, six years after his coming of age, he brings a bill for an account, the statute of limitations was a bar to such suit, *as it would be to an action of account at common law;* for this receipt of the profits of an infant's estate was *not such a trust as, being a creature of a Court of equity,* the statute shall be no bar to, for he might have had his *action of account against him at law,* and, therefore, no necessity to come into this Court for the account. If the infant lies by for six years after he comes of age, *as he is barred of his action of account at law, so shall he be of his remedy in this Court;* and there is no sort of dif- ference in reason between the two cases."

*But those trusts which are mere crea- tures of a Court of equi- ty, and not within the cog- nizance of a Court of law, are not within the statute of limitations.* The doctrine of this case is, that the trusts which are not within the statutes, are those which are creatures of the Court of equity, and not within the cognizance of a Court of law; and that as to those other trusts which are the ground of an action at law, the statute is, and in reason ought to be, as much a bar in the one Court as in the other. The statute is a bar to a bill for an account, when it would be a bar to an action of account at common law for the same matter, and for which the party might have had his action of account. The case was so understood by Lord *Redesdale,* and he cites it with approbation in a case which I shall hereafter refer to, to show that a Court of equity is as much barred as a Court of law by the statute of limitations.

This single case, resting upon such authority, and with such marked and significant discrimination between the character of the trusts that are within and without the operation of the statute, appears to me to be decisive upon the point now under consideration.

The case of *Lawley* v. *Lawley,* (9 *Mod. Rep.* 32. 9 *G. I.*) arose soon after, before the same Lord Chancellor; and it cannot readily be supposed that he intended, by any thing in this case, to interfere with a rule he had shortly before so explicitly declared and illustrated. In this case,

lands were settled by will on trustees; and one of the trusts was, that if the son's wife survived, she was to receive the rents and profits of the lands, as the same were at that time let. Her husband afterwards greatly increased the rents, and upon his death the wife enjoyed the whole of the rents, making no distinction between the original and the additional rent. A number of years after her death, her executor was sued, by the devisee in tail, being a grandson of the testator, for an account of the surplus rents received by her and by her executor. The plea of the statute of limitations was overruled, "because the estate in law was in trustees," and the executor was decreed to account for the improved rents received by her, or by him since her death.

There is no reason given for this decree, but what is to be inferred from the single observation, that *the estate in law was in trustees*, and that must be understood to mean that the plaintiff in the bill had not the legal title, and could not have maintained an action at law. The legal estate was in trustees, in trust " to the first and every other son and sons of Sir *Thomas* in tail male," and the plaintiff was such a son. This construction of the case renders Lord *Macclesfield* perfectly consistent with himself in the preceding case. It is clear, says Sir *Wm. Grant*, when commenting upon this case, (2 *Merivale*, 360.) " that under any other circumstances, the demand for these rents would have been barred; but it was considered *that so long as the trust subsisted*, so long it was impossible that the *cestui que trust* could be barred. The *cestui que trust* could only be barred by barring and excluding the estate of the trustee." I cannot but think, with very great respect, that the Master of the Rolls is not very clear and satisfactory in his commentary upon the case. It was not a suit between trustee and *cestui que trust*. The trustees seized of the legal estate under the settlement were not sued, and yet he says, the *cestui que trust* could only be barred, by

1823.

KANE
v.
BLOODGOOD.

barring the estate of the trustee. It was a suit by one *cestui que trust* against the representative of another *cestui que trust,* for receiving more of the rents than belonged to her; and I see no good reason why, *as between them,* the statute should not have applied, unless we adopt the plain rule upon which alone the decision is intelligible and just, that the plaintiff was a *cestui que trust,* without any title or remedy at law.

There is no statute of limitations to a charge upon an estate.

It is a general rule in the books, that there is no statute of limitations to a charge upon an estate. Thus, in *Collins* v. *Goodall,* (2 *Vern.* 235.) the statute was pleaded to a bill for rent charged on land by will, and it was held that it did not apply; and so again, in the modern case of *Stackhouse* v. *Barnston,* (10 *Vesey,* 453.) the Master of the Rolls said, that in equity the statute is never permitted to prevail against a legal rent charge. And, in *Norton* v. *Turvill,* (2 *P. Wms.* 144.) a wife, before marriage, had conveyed her estate in trust to her separate use, and during coverture had borrowed money upon bond. The bond was held void, and after her death a bill was filed against her husband and her executors. The Master of the Rolls held, that her separate estate was a trust estate for the payment of debts; and speaking in reference to that trust, he said, a trust was not within the statute of limitations. These cases of charges upon land I have alluded to as going in support of the distinction, which I apprehend is the prevailing one, that the trusts upon which the statute does not operate, are those trusts of which equity has the proper and the exclusive cognizance. I take it for granted, as the assumed doctrine in all these cases, that an action at law will not lie in the case of a mere charge upon land, where there is no personal undertaking. And if there be a personal contract, the statute cannot be pleaded at law in the case of rent, if it be reserved by indenture, or even on a lease in writing, according to what was said in *Hodsden* v. *Harris,* in 2 *Saund.* 66.

For an action at law does not lie in the case of a mere charge on land, where there is no personal undertaking.

We have a series of decisions of Lord *Hardwicke* on this subject, in which I think it will appear, that the distinction taken by Lord *Macclesfield*, in respect to the statute of limitations, has been preserved.

In *Prince* v. *Heylin*, (1 *Atk.* 493.) Lord *H.* held, that the statute was a bar to any demand from one tenant in common against another for an account, further back than six years. "An action of account," he observes, "lies for one tenant in common against another, and such action is expressly mentioned in the statute of limitations ; and as there is no remedy at law, (meaning after six years,) there can be no reason for any in equity." All this is perfectly intelligible, and so far applicable as the case before him was one concerning tenants in common. But the observation respecting the limitation was quite unnecessary ; for the Chancellor admitted that no advantage could be taken of the statute of limitations, as it had neither been pleaded nor insisted upon in the answer ; and I have referred to the case, because it contained the sanction of Lord *Hardwicke* to the rule, that where the party has a remedy at law, by an action of account, for the same subject matter for which the bill is filed, " there can be no reason" why the statute of limitations should not apply to the suit in equity, as well as to the suit at law. What shall we say, then, to the other remark in the same case, that " in the case of joint tenants or parceners, there is a mutual trust between them, and they are accountable to each other without regard to the length of time ?" Is it possible, I would ask, to make such a distinction between tenants in common and joint tenants, when, by the common law, no action of account lay by one joint tenant, or tenant in common, against another, unless he had constituted him his bailiff; and when, by the statute of 4 *Anne, ch.* 16. an action of account was given equally to joint tenants and tenants in common against each other, for receiving an undue proportion of the profits of the estate? The observation of

The statute is a bar to any demand from one tenant in common against another, for an account further back than six years.

Observation of Lord Hardwicke, in 1 *Atk.* 493. *Prince* v.*Heylin,* doubted.

1823.

KANE
v.
BLOODGOOD.

Where there is a legal and an equitable remedy, in respect to the same subject matter, the latter is under the control of the same statute bar as the former.

Lord *H.* was entirely extra-judicial; and, probably, it might safely be placed to the account of the inaccuracy of the reporter; as it is well known, that the reports of *Atkyns* abound in mistakes. Afterwards, in *Brereton* v. *Gamul,* (2 *Atk.* 240.) which was a case of a bill for discovery, and to be let into the possession of real estate, and the statute of limitations was pleaded in bar, Lord *H.* held, that, *if the plaintiff had lost his right by a legal bar, he can have no remedy in equity.* This case very clearly shows, that, where there is a legal and an equitable remedy, in respect to the same subject matter, the latter is under the control of the same statute bar with the former.

Again; in *Sturt* v. *Mellish,* (2 *Atk.* 610.) Lord *H.* expressly, and after much deliberation, adopted the distinction of Lord *Macclesfield,* as to the character of the trust, which was to be exempted from the statute. An account was stated between the plaintiff and one *Villa Real,* and a considerable debt was due from *S.* to *V. R.,* and the plaintiff constituted *V. R.* his attorney, to recover moneys in *Portugal,* and the whole transaction was with the government of *Portugal.* The bill was filed against the executor of *V. R.,* for an account, and the statute of limitations was held to be a bar to the suit; and that it was not the case of a trust unaffected by the statute. " A trust," he observes, " is where there is such a confidence between parties, *that no action at law will lie,* but is merely a case for the consideration of this Court; and every bailment might as well be said to be a trust as this." In the next case, of *Pomfret* v. *Windsor,* (2 *Ves.* 472.) the effect of the statute upon a trust was considerably discussed. It was a bill to have, among other things, execution of a trust for raising 20,000 pounds out of a real estate, at the distance of 27 years; and, although a fine had been levied, Lord *Hardwicke* held, that a fine by persons in possession and *non-claim, the legal estate being in trustees,* was no bar to an equitable charge under a deed

of trust, and to a claim of the *cestui que trust*, calling
upon the administrator for an execution of the trust of
the real estate. The fine was levied by Lady *Windsor*,
as administratrix, and guardian in possession of the real
estate, and a trustee of the 20,000 pounds, which was the
charge upon the land. The *possession was not an adverse one,*
and the claim was purely of equitable cognizance in
respect to the charge. Yet even here, Lord *H.* ob-
served, that the statute of limitations did not stand in the
plaintiff's way, " for it was not pleaded or insisted upon
at the bar." And, further, the admissions were so strong,
" that, if this had been a case within the statute, and
that insisted upon against the account, it had been sufficient
to take the case out of the statute." This case, therefore,
is in no respect inconsistent with the distinction which has
been deduced from the preceding cases. And when we
come down to a later period, we shall perceive that the
analogy between the legal and the equitable remedy, when
both existed in respect to the same subject matter, has
been strongly and emphatically declared, and strictly and
uniformly preserved.

Thus, in *Smith* v. *Clay*, (3 *Bro.* 639. *note.*) Lord
*Camden* observed, that, " as often as Parliament had
limited the time of actions and remedies to a certain pe-
riod in legal proceedings, the Court of Chancery adopted
that rule, and applied it to similar cases in equity. *For
when the Legislature had fixed the time at law, it would
have been preposterous for equity to countenance laches be-
yond the period that law had been confined to by Parliament.*
In all cases, where the legal right has been barred by
Parliament, the equitable right to the same thing has been
concluded by the same bar." Again; in *Harwood* v.
*Oglander*, (6 *Ves.* 199. 8 *Ves.* 106.) the question was
concerning a trust, in respect to real estate, and time was
not allowed to operate as a bar, but by way of evidence,
as raising a presumption of ouster. The party claiming

*1823.*

KANE
v.
BLOODGOOD.

did not dispute the title of those in possession, but alleged a title in himself, as tenant in common; and the case contains nothing more on that point, than the doctrine at law, (*Doe* v. *Prosser, Cowp.* 217.) that the possession of one tenant in common, *eo nomine,* as tenant in common, can never bar his companion, because such possession is *not* adverse, but in support of the common title; and in that case, the Master of the Rolls observed, that he " should be sorry to have it understood to be the rule of the Court, that there is no limitation whatsoever to trust estates; and that, let the legal title once get into a trustee, the *cestui que trust* may permit others to enjoy the property, and come to this Court at any distance of time for an account. It would be perfectly alarming." He expressed a strong opinion against granting the account further back than six years.

In *Stackhouse* v. *Barnston,* (10 *Ves.* 453.) the Master of the Rolls said, that though the statute of limitations does not apply to any equitable demand, yet equity takes the same limitation in cases that are analogous to those in which it applies at law; and he said, that an account of rents and profits was limited to six years, by analogy to legal limitations.

This application of the statute by analogy, cannot well be made to cases of those peculiar trusts which are the mere creatures of equity ; for there is no ground for comparison; but when the same subject matter of the demand in equity can also be made the subject of an action at law, the rule of analogy applies in all its force, as Lord *Redesdale* observed, in *Bond* v. *Hopkins,* (1 *Sch. & Lef.* 413.) the statute of limitations does not apply in terms to proceedings in Courts of equity, but equitable titles are affected by analogy to it. If the equitable title be not sued upon, within the time within which a legal title of the same nature ought to be sued upon, to prevent the bar of the

statute, the Court, acting by analogy to the statute, will not relieve.

Lord *Redesdale*, afterwards, in *Hovenden* v. *Lord Annesley*, (2 *Sch. & Lef.* 607.) went much more at large into the doctrine of the limitation of actions in equity; and the principle of that case is, that if the equitable title be not acted upon in the same time the legal title should be, it is barred. "Courts of equity are bound to yield obedience to the statute of limitations upon all legal titles and legal demands, and cannot act contrary to the spirit of its provisions." I understand this proposition to mean, that if the party has a legal title, and a legal right of action, and instead of proceeding at law, resorts to equity—instead of bringing his action of account, or detinue, or case, for money had and received at law, files his bill for an account, the same period of time that would bar him at law will bar him in equity. This is the principle that pervades the cases. Lord *R.* proceeds to observe, that "Courts of equity have constantly guided themselves by the principle, that wherever the legislature has limited a period for law proceedings, equity will, in analogous cases, consider the equitable rights as barred by the same limitation. I take it for granted," he says, "that the position that trust and fraud are not within the statute, is qualified just as Lord *Macclesfield* qualifies it in the case of *Lockey* v. *Lockey*." We have already seen in what manner Lord *M.* qualifies the position as to trusts; and what stronger sanction could Lord *R.* have given than this to the principle contained in that leading case, and upon which this whole argument rests?

He adds, further, in this case, that if the trustee is in possession, (speaking of real estate,) and does not execute his trust, the possession of the trustee is the possession of the *cestui que trust;* and if the only circumstance be, that he does not perform his trust, his possession operates nothing as a bar, because his possession is according to his title. As, in the case of a lessee for years, though he does not

**1823.**

KANE
v.
BLOODGOOD.

pay his rent for 50 years, his possession is no bar to an ejectment after the expiration of his term, because his possession is according to the right of the party against whom he seeks to set it up.   Again, he says, that every new right of action in equity that accrues to the party, whatever it may be, must be acted upon, at the utmost, within 20 years. If a mortgagee has been in possession for a great length of time, but has acknowledged that his possession was as mortgagee, and therefore liable to redemption, a right of action accrues upon that acknowledgment.   But if not pursued within 20 years, the statute may be pleaded; and so in every case of equitable title, (*not being the case of a trustee, where possession is consistent with the title of the claimant,*) it must be pursued within 20 years.

The statute of limitations receives the same construction and application, in analogous cases, in equity as at law.

It is easy to perceive, that the doctrines here laid down are the same that govern courts of law in analogous cases, and the statute of limitations receives the same construction and application at law and in equity.   It is equally said, that fraud as well as trust is not within the statute, and it is well settled that the statute does not run until the discovery of the fraud; for the title, to avoid it, does not arise until then, and pending the concealment of it, the statute ought not in conscience to run; but after the discovery of the fact imputed as fraud, the statute runs as in other cases.   This was the true ground of the case of *Booth* v. *Lord Warrington,* (1 *Bro. P. C.* 455.) and this was the rule declared in the case of the *South Sea Company* v. *Wymondsell;* (3 *P. W.* 143.) and Lord *Redesdale,* in the case on which I have so long dwelt, approves of the rule.(*a*)

In the case now before me, if the directors of the *Hamilton Manufacturing Society* had passed the dividend to the credit of *J. & A. Kane,* and there had been no demand and refusal, the possession of the fund would have been *consistent* with the title of the *cestui que trust,* and the statute would not have been a bar.   But, after a refusal to

(*a*) See *Troup* v. *Smith's Executors,* (20 *Johns. Rep.* 33.)

pay, and a denial of title, the possession becomes *adverse*, and it is as just and reasonable that the statute should run and bar the party, who is apprized that his right is denied, and yet sleeps on that right, as that it should bar the party who has knowledge of the fraud, and neglects his remedy.

The case of *Beckford* v. *Wade*, (17 *Vesey*, 87.) arose upon a construction to be given to an exception in the statute of limitations of the island of *Jamaica*, which declared that the act should not be held to extend to a possession held by trustees. The Master of the Rolls held, in that case, that the exception meant not constructive trusts, but only direct or express trusts between *cestui que trusts* and their trustees, upon which length of time does not bar, and ought to have no effect, and that it did not extend to every equitable question relative to real property.

The case concerned real estate; and the observation of Sir *Wm. Grant*, and which is so frequently met with in the books, that time does not bar a direct trust, as between trustee and *cestui que trust*, is precisely the same principle that applies at law to tenants in common, where the statute does not run but from actual ouster, because the possession of one is not adverse to the right of the other, but is in support of the common title. It does not bar, so long as the trust is a continuing and acknowledged trust. In *Harwood* v. *Oglander*, already cited, it was considered by Lord *Alvanley*, and afterwards by Lord *Eldon*, that if a trust subsisted, so that the trustee could recover as having the legal estate, it would follow, that the right of the *cestui que trust*, as against the trustee, could not be barred. But supposing the trustee was to deny the right of his *cestui que trust*, and assume absolute ownership, is there any case in equity that would allow the latter his remedy, beyond the period limited for the recovery of legal estates at law? So long as the trust is a *subsisting* one, and admitted by the act or declarations of the parties, no doubt the statute does

1823.
KANE
v.
BLOODGOOD.

not affect it; but when such transactions take place between trustee and *cestui que trust*, as would, in the case of tenants in common, amount to an *ouster* of one of them by the other, I can hardly suppose that a Court of equity would consider length of time afterwards as of no consequence. There is no good reason why the statute of limitations should not apply to such a case, as well as to cases of constructive trusts, and to cases of detected fraud, and to all other cases in which the statute is assumed as a rule of decision.

" The general doctrine, in this country," says the Master of the Rolls, in *Beckford* v. *Wade*, " is against applying statutory limitations to cases of trust. As our statute bars only legal remedies, *of course it has no direct operation upon trusts, for which there was no remedy but in Courts of equity.*" This last sentence shows what kind of trusts Sir *W. Grant* had in contemplation, when he said the statutory limitations did not apply to trusts; and he assumes as correct the distinction between those trusts which are the creatures of equity, and known there only, and the other cases of trusts, over which courts of law have concurrent jurisdiction. It is as to those " trusts for which there was no remedy, but in courts of equity," that the statute does not operate; and Lord *Camden*, as we have seen, considered it as preposterous, that the statute should not apply to the equitable, when it would apply to the legal remedy.

The successor of Lord *Redesdale* expressed his opinion on the subject of the application of the statute to equity cases, in *Medlicot* v. *O'Donnel*, (1 *Ball* & *B*. 156.) and declared that he considered the statute of limitations as founded upon the soundest principles, and the wisest policy; and that the Court of Chancery, for the peace of families, and to quiet titles, was bound to adopt it *in cases where the equitable and legal titles so far corresponded, that the only difference between them was, that the one must be enforced in a Court of equity, and the other in a Court of law.* He added,

further, that where there was no continuing or subsisting trust, the same principle would apply. In *Cholmondeley* v. *Clinton,* (2 *Merivale,* 93.) there was much discussion on this subject. The plaintiff claimed to be entitled to the equity of redemption of a mortgaged estate which was subsisting in trustees, and he prayed that the defendant might be decreed to reconvey, and to deliver up possession, and to account for the rents and profits. The defendant insisted, that trustees had been in quiet possession for upwards of twenty years, and he claimed the benefit of the statute. The Master of the Rolls, in giving his opinion, stated, that it was *admitted that an equity of redemption subsisted,* in the case, and so long as it did subsist, the question to whom it belonged was open, and some person was entitled to redeem. The trust subsisted. The mortgagee was trustee of the legal estate for the plaintiff, who had the equity of redemption. He held that the statute did not apply, because the possession of twenty years *was not in the character of owner of the legal estate,* nor under any claim of being so entitled. The subsistence of the mortgage had been all along recognised. Even at law, mere possession is not sufficient to bar the claim of the true owner; there must be something tantamount to a disseisin.

I refer to this case, as containing a clear illustration of what is meant by the doctrine, that no time bars in the case of a direct or express trust, continuing and subsisting, as between the parties to the trust. In that case, the trustee had done nothing *adverse* to the title of the plaintiff. The legal estate remained untouched, and the case contains, throughout, an acknowledgment of the principle, that equitable demands will be barred by the same length of time, by which, if it were a legal question, in an action by which the party sought to recover, it would be barred.

There have been some decisions in this Court, which have been referred to, as being unfavourable to the plea.

In *Decouche* v. *Savetier,* (3 *Johns. Ch. Rep.* 216, 217.)

1823.

KANE
v
BLOODGOOD.

1823.

KANE
v.
BLOODGOOD.

Explanation
of the case of
*Decouche* v.
*Savetier*, vol.
3. p. 216. as to
the plea of the
statute of li-
mitations in
cases of trust.

I observed, that no time bars a direct trust, as between trus-tee and *cestui que trust*, so long as the trust subsists, and I referred to the case of *Cholmondeley* v. *Clinton*. But these general expressions must be taken under the same restriction that is applied to them when used in the books. We have seen the sense in which they must have been used by the Master of the Rolls, in one of the cases mentioned; and the same undefined language is used by Lord *Hardwicke*, in *Lewellin* v. *Mackworth*, (15 *Vin.* 125. T. pl. 1. note.) and by Mr. J. *Ashurst*, as one of the Commissioners, in *Townsend* v. *Townsend.* (1 *Cox*, 28.) The maxim is, doubt-less, to be received subject to the distinctions which the deci-sions authorize. But I am now led to apprehend, in conse-quence of a more thorough examination of the question, that I did not lay sufficient stress in that case, upon the circum-stance, that *by the statute law of this State,* (a) actions at law, of debt, detinue, or account, may be brought for legacies and distributive shares. In *England,* it is the proper and ex-clusive province of the Courts of equity to enforce the pay-ment of legacies, and distributive shares; and, following the *English* cases, I concluded that the statute of limitations, did not apply to such demands. The rule, as to a legacy, has sometimes been said to be upon the ground of a trust, and sometimes that it is impossible to say from what time the statute shall run, as the legacy is payable when the executor shall have possessed assets sufficient for debts and legacies, which may be at an indefinite time. The Master of the Rolls, in *Smallman* v. *Lord Hamilton*, (3 *Atk.* 71.) seemed rather to be dissatisfied with the doctrine, that the statute of limitations was not applied to a legacy, as well as to other cases; but I assume it to be well settled in *Eng-land,* that the statute does not apply to legacies and dis-tributive shares, and that the remedy, to enforce payment, must be sought in Chancery. As we, however, have a *legal*

(a) 1 *N. R. L.* 311. *sess.* 36. *ch.* 75. *sects.* 19 *and* 20.; but no action at law, for a legacy, lies against *terre tenants.* (*Pelletreau* v. *Rathbone*, 18 *Johns. Rep.* 428.)

*remedy* provided, by action at law, it becomes a very serious question, whether this Court, possessing now only a concurrent jurisdiction, is not bound, upon established principles, to apply the same limitation to the equitable, which is given to the legal remedy? And if we assume it to be the rule at law, that the statute of limitations does apply to actions at law, for legacies and distributive shares, then, in that view, and in that view only, I have doubts as to the soundness of that part of the decision in *Decouche* v. *Savetier*.

In the still more recent case of *Coster* v. *Murray*, (5 *Johns. Ch Rep.* 522.) I referred, generally, to what was said by me in the preceding case, that the statute did not reach to matters of direct trust, as between trustee and *cestui que trust;* and I held, that the statute did not apply to the case of a gratuitous bailment or trust. But though that decree was affirmed in the Court of Appeals, yet, I understand, it was upon other ground than that upon which I had rested the decree, and that the Judges of the Supreme Court did not consider it as the case of a trust not within the reach of the statute, because an action at law, of account, or for money had and received, could have been sustained for the same matter, and the equitable remedy, in a case of concurrent jurisdiction, was subject to the same limitation as the legal. If I am not misinformed as to the decision, (for the case has not, as yet, been reported,) (*a*) it is a decisive authority, in favour of

1823.

KANE
v.
BLOODGOOD.

Since a *remedy* at *law* is given by statute to recover legacies or distributive shares, it seems that the statute of limitations will be a bar to a suit for a legacy in equity, as well as at law.

(*a*) Since reported, 20 *Johns. Rep.* 576—610. Mr. Ch. J. SPENCER, with whom a majority of the Court concurred, did not consider that as a case of *trust*, in its technical sense; and after adverting, with approbation, to the opinion of *Lord Hardwicke*, in *Sturt* v. *Mellish*, (2 *Atk.* 610.) and showing that the plaintiff had ample remedy at law, he observed, " I have, therefore, no hesitation in saying, that, in a case where there is a concurrent jurisdiction in the Courts of common law and of equity, the rule must be the same, and the statute of limitations may be pleaded with the same effect in the one Court as in the other. In cases of trusts and fraud peculiarly, appropriately and exclusively the objects of equity jurisdiction, according to the established doctrine, the statute cannot be pleaded."

the doctrine which I have now endeavoured to deduce from the history of the cases; and it was the discussion upon the appeal in that very case, that led me to suspect that I had been misled by some of the earlier decisions, in the time of *Charles* II., on which I have now ventured freely to comment, and by the exceedingly loose manner in which the rule, as to trusts, had been spoken of in the books.

My conclusion upon this branch of the plea is, that *J. & A. Kane,* according to the statement in the bill, had a legal cause of action existing in 1804, for the dividends or profits arising on the seven shares, and that, upon the demand and refusal charged in the bill, interest commenced, and a right of action accrued against the society. That right, not having been pursued within six years, the plaintiffs are barred at law, and by analogy and in obedience to the statute, they are, upon established principles of equity, equally barred in this Court.

The statute of 1811 was (at least upon the first argument) supposed to have a material influence upon the question, and was one of the two grounds upon which resistance to the plea was placed. That act declared, that, upon the dissolution of any corporation, the managers of its affairs at the time should be *trustees,* with power to settle its concerns, collect its debts, *and pay the debts owing by the corporation at the time of its dissolution,* and make distribution among the stockholders. (34 sess. ch. 235.) The reasonable construction of the act is, that the trustees succeeded to all the rights and privileges of the directors, and to the same means of defence. The construction is a very forced one, that the Legislature intended to compel those trustees to pay debts barred by the statute of limitations, and thereby to deprive them of the benefit of the legal intendment, that a stale demand is satisfied, when they may have lost the vouchers requisite to prove it. They are undoubtedly trustees, by means

*Directors of an incorporated society, who are by statute, on its dissolution, made trustees, with power to settle its concerns, &c. are entitled to the benefit of the plea of the statute of limitations.*

of the powers and duties conferred upon them, and they are not the more so by the use of the term trustees. The directors under the charter were equally trustees, charged with the management of the affairs of the corporation. Executors and administrators are also trustees, charged with the payment of debts to the extent of the assets; and yet it cannot be doubted, that they are entitled to plead the statute of limitations. The commissioners, under a commission of bankruptcy, are trustees for the creditors; and yet it is decided, that the statute may be objected to the proof of a debt under the commission. (*Ex parte Dowdney*, 15 *Ves.* 479.) With respect to a class of cases construing a devise to pay debts, to include debts barred by the statute, and which are supposed to afford an argument, from analogy, the doctrine on that subject, supposed to be warranted by the earlier cases, is quite overturned by the latest authorities; and this I had occasion to show in *Roosevelt* v. *Mark*, decided in *August* last. (*a*)

I have assumed it as a settled point, that the directors of the society, prior to its dissolution, were entitled to plead the statute, in ordinary cases, like a private individual. In suits by or against a corporation, the statute of limitations may be pleaded, as in suits between private persons. (*Wych* v. *The East India Company*, 3 *P. Wms.* 309. *South Sea Company* v. *Wymondsell*, 3 *P. Wms.* 143.)

The next part of the plea is, that the plaintiffs are barred of their action for the dividends or profits on share No. 41, prior to the 1st of *July*, 1815.

The bill states, that the certificate for share No. 41, held by *L. G.*, was duly assigned to *J. & A. Kane*, on the 10th of *September*, 1804, together with all the profits arising thereon, from the 1st of *May* preceding. This certificate, with the assignment endorsed, was delivered, soon after, by the assignees, to the factor of the society, who received this, as well as the other six certificates and

*Margin notes:*

1823.

KANE
v.
BLOODGOOD.

*Corporations, as well as private persons, may plead the statute of limitations.*

(*a*) *See vol.* 6. *p.* 266.

assignments, as valid. The bill avers, that the assignment of this, as well of the other certificates, was valid in law, according to the course and practice of the society. This certificate, No. 41, was retained by the factor, who delayed giving a new certificate for it, or paying the profits that had arisen thereon, until the 10th of *November*, 1804, when the assignees demanded a new certificate and payment, and the factor refused either to give the certificate, or to make payment, until a sum alleged to be due from *L. G.* on the share, together with interest thereon, should be paid. The bill further states, that, to give colour to such refusal, the directors, on the 16th of *November*, 1804, *resolved*, that the certificate No. 41, *be retained*, and no new certificate issued in lieu of it, until the *sum due on that share, and the interest, were paid;* and that the factor should not pay to *L. G.*, or his assigns, *any dividend due* or to become due, until such payment; under pretext of which, a certificate for the stock, or the payment of the dividends due thereon from 1st of *May*, 1804, was "unjustly and fraudulently withheld, though repeatedly demanded." It is also stated, that *L. G.* was a man of large fortune, and the society held one or more notes of his for the share, amounting to 900 dollars, dated the 1st of *May*, 1797, with interest, the payment of which might have been enforced, or the profits retained. The bill also states, that the society unjustly and fraudulently, after notice of the assignment of the seven shares and the profits, from the 1st of *May*, 1804, and after the resolution aforesaid, *neglected to retain profits in their hands belonging to L. G.*, sufficient to have satisfied the notes and all demands on account of share No. 41, and that the society *actually paid to L. G.*, on the 19th of *November*, 1804, 100 dollars; on the 27th of *December*, 1804, 500 dollars; on the 14th of *January*, 1805, 100 dollars; on the 14th of *September*, 1805, 200 dollars, on account of dividends on stock, and due to *L. G.*, and one seventh of the dividends, so

declared and due, were credited on share No. 41. The bill further states, that half-yearly dividends were declared, and paid or credited, on each share of stock, from the 1st of *November*, 1804, to the 1st of *May*, 1808, and occasional dividends afterwards, in 1809, 1810, and 1813; and that *J. & A. Kane* were " entitled to receive and be paid the like dividends on share No. 41, but that the payments thereof, though often requested of the society and their factor, were unjustly and fraudulently withheld, under a combination of the false and fraudulent pretexts aforesaid." The bill then claims dividends on the share No. 41, from the 1st of *May*, 1804, to the 15th of *May*, 1813, amounting to 1165 dollars and 11 cents, together with interest on each of the dividends from the times they were respectively declared; and avers, that none of the profits or dividends on share No. 41, were allowed, or credited, or paid, to *L. G.* in his lifetime, before the transfers of the seven shares, and notice thereof. The bill further states, that the *Hamilton Manufacturing Society*, on the 2d of *August*, 1805, filed a bill against *L. G.* and four others, on which issue was joined, and a reference, to take and state an account between the parties, was ordered, and *L. G.* then died; that the suit was revived against the representatives of *L. G.*; and on the 24th of *July*, 1820, a decree rendered, founded on the Master's report of the 25th of *April* preceding, that the executrix of *L. G.* pay to the company 10,713 dollars and 54 cents, with interest from the 6th of *April*, 1820; that the company, on the reference in that suit, charged the note or notes for 900 dollars, the balance alleged to have been due on share No. 41, and interest *on the notes*, and the same was allowed by the master in his report, and included in the decree against the executrix of *L. G.*; that none of the dividends on share No. 41, from the 1st of *May*, 1804, were allowed or credited to the executrix of *L. G.*, and those profits had not been credited or paid to *L. G.* in his life-

time, before the transfers of the seven shares, and of such profits as had been made and delivered to the society as aforesaid.

Upon this statement of facts, it would seem, that the assignees of *L. G.* had a valid right of action at law, for the dividends or profits arising on share No. 41. The assignees might have been let in to parol proof of the assignment or transfer of share No. 41, and of the profits thereon, from the 1st of *May*, 1804, if the society had refused inspection of the instrument, which they retained. They could have supplied the absence of the certificate, or compelled its production, as a matter of evidence, by lawful means, and have established their right to an account of those profits. I do not apprehend, that the issuing of a new certificate was indispensable to their title to the dividends, for they had been duly assigned by *L. G.* and the assignment averred to be valid, according to the course and practice of the society; and the society had notice of the assignment, and were in possession of the transfer itself, which was withheld, as the bill avers, upon false and fraudulent pretexts. The bill, however, states, that the society refused to surrender up the certificate and transfer endorsed upon it, or to issue a new certificate, or to pay to *L. G.* or to his assigns, any dividends due or to grow due on the share, until a debt, with interest, which they claimed upon the share, was paid. This was, according to the bill, an unjust and fraudulent proceeding, without truth or justice to warrant it; and I entertain no doubt that, upon the allegations in the bill itself, a just cause of action existed in the autumn of 1804, and at every succeeding period, when dividends were declared, for an account and payment of the dividends. The transfer was an order by *L. G.* upon the society, to pay the dividends to *J. & A. Kane*, and by accepting and retaining the transfer, the society recognised the title of the assignees, though upon unfounded pretexts they considered it as *subject to a lien*, which they claimed upon the share and its proceeds, for a debt due from *L. G.*

The remedy at law thus clearly existing, it follows from the doctrine already sufficiently shown and illustrated, that the plaintiffs cannot resist the plea of the statute of limitations, upon the ground of an original and direct trust. They must succeed, if at all, upon the ground that the bill contains a charge of facts and circumstances, constituting an equitable bar to the interposition of the statute, and that the answer put in as auxiliary to the plea has not, as it ought to have done, met those circumstances, and fully and precisely denied them. There is no doubt of the existence and good sense of this rule of pleading. It was fully explained and supported in the case of *Goodrich* v. *Pendleton;* (3 *Johns. Ch. Rep.* 384.) and the only question is, whether the facts in this case be such as to warrant the application of the rule.

The resolution which a majority of the board of directors passed on the 16th of *November*, 1804, retaining the certificate for share No. 41, and the dividends thereon, did not, of itself, work any legal suspension of the right of action for those dividends. This, I apprehend, could not well be maintained, and the bill contradicts it, and does, in substance and effect, if not in terms, insist on a continued and subsisting right of action, from the time of the demand and refusal. That refusal amounted to a conversion of the proceeds, and the statute of limitations began to run from that time, and the defendants are entitled to the benefit of it, provided they are not precluded by those charges in the bill which may take the case out of the statute, unless they are sufficiently met and denied by the answer. The charge I principally allude to, is, that very resolution of the board of directors to retain the certificate of share No. 41, and not to issue another, and to retain the dividends due, and to become due thereon, *until payment should be made of a debt of L. G. on that share,* and for which the society held his stock note for 900 dollars. Another charge in the bill, in relation to this point, is, that in 1805, the society filed a bill

1823.

KANE
v.
BLOODGOOD.

1823.

KANE
v.
BLOODGOOD.

in this Court for an account against *L. G.*, and which suit was not brought to a final hearing against his representative until 1820, when that very note for 900 dollars, was charged as the balance due on share No. 41, and allowed by the Master; and the sum reported due was afterwards collected and paid. Was not this resolution of the directors an acknowledgment that the dividends were to be retained by them, in trust for the assignees, but subject to their lien, until the debt for which it was retained in pledge was paid, and which, according to the charge in the bill, the society admitted was an unsatisfied debt in 1820? It would seem to be against conscience, and an act of fraud, for the society to be permitted to avail themselves of the statute, when, by their own act, they had postponed the payment until the happening of a certain event, and which did not take place until within the last six years. A pure plea of the statute is no bar, where there are circumstances stated in the bill which take the case out of it, as an offer to account, an acknowledgment of the debt, a promise to pay, or to do what was right and just, or a promise to pay when assets came to hand, unless the plea be accompanied with an averment or answer, destroying the force of these circumstances. (*Beames' Pleas*, 169. and the cases of *Pomfret* v. *Windsor*, 2 *Ves.* 485. *Andrews* v. *Brown, Prec. in Ch.* 385. *Baillie* v. *Sibbald*, 15 *Ves.* 485; and *Galway* v. *Earl of Barrymore*, there cited; and see also, 3 *Atk.* 70. anon.) Lord *Manners* intimated, (in *Barrington* v. *O'Brien*, (1 *Ball & B.* 178.) that to persuade a party not to prosecute by holding out promises until the debt is barred by the statute, was a fraud; and that a plea of the statute ought not to be sustained. Mr. *Beames*, in noting this case, supposed that such promises could, generally speaking, prevent a pure plea of the statute holding as a bar.

My impression, from these facts, is, that the society cannot be permitted to rest upon the statute, if their resolu-

*A pure plea of the statute of limitations, is no bar, where there are circumstances, as an offer to account, acknowledgment, promise to pay, &c. to take the case out of it, unless there be an averment, or answer, destroying the force of such circumstances.*

tion stood unrevoked, and the debt for which the dividends were retained in pledge was not paid, until within the last six years; because, during all that time, we must contend that there was a *continuing and subsisting trust*, by their own acknowledgment, as to those dividends. This inference is the stronger, when we consider the further fact, avowed in the bill, that none of the dividends on share No. 41, were allowed or credited to the representative of *L. G.*, nor allowed or credited or paid to him in his lifetime, before the transfer of the share, as already mentioned; and when we also take into consideration the fact avowed in the answer accompanying the plea, that *J. K.*, about the year 1813 or 1814, presented to the society an account, in which he charged the society with the value of the share, No. 41, and the dividends accrued thereon, " and that he was allowed, in account with the society, for the same." If we were to assume as valid the claim of the society to hold the share, No. 41, and the dividends thereon, by way of pledge or security for the debt of *L. G.*, (and the society cannot object to this assumption,) the assignees had a right to redeem, at any length of time, indefinitely, (as there was no specified time of redemption,) until the debt was paid, or until they were called upon by the society to redeem. If the society took no effectual measures to recover that debt, until 1820, and never called upon the assignees, in the mean time, to redeem, they surely cannot be permitted, in this suit, to interpose the statute of limitations, pending their own delay. When it is stated in the answer, that *J. K.*, in 1813, charged the society with the value of share No. 41, and that *he was allowed in account for it*, I do not understand the defendants to mean that it was settled, for then they would have set up payment, without resorting to the plea. They must have meant, that it was allowed in the account as a subsisting demand. It was, in fact, a recognition of the trust.

This view of the question, in respect to share No. 41,

1823.

KANE
v.
BLOODGOOD.

was not considered by me upon the former discussion, because it was not distinctly put forward on the part of the plaintiffs, who seemed to rely upon the application of the general doctrine, that no time bars a direct trust in this Court, and which doctrine, under the explanations which have been given, I am obliged, according to my sense of the law, to consider as inapplicable.

I shall, accordingly, according to the former decree, hold the plea to be good, not only to so much of the bill as relates to the expenditures of moneys by the plaintiff, *J. K.*, but to so much of the bill as relates to the dividend or profit on the seven shares, from the 1st of *May* to the 9th of *October*, 1804; and I shall overrule the plea as to so much of the bill as relates to the dividends on share No. 41, and direct that the plea, as to that part of the bill, stand for an answer, with liberty to the plaintiffs to except. And I shall also, as before, allow the plaintiffs to amend their bill as they shall be advised, and as the practice of the Court shall warrant, upon payment of costs, and the other usual terms, and with liberty also, within twenty days, to except to the answer.

Order accordingly.