Carr, J.
The argument in this case, though on a preliminary question, was very elaborate, and calculated to give a full view to the whole subject. The great question discussed was, whether under the circumstances as disclosed by the bill and answers, particularly, the length of time, the case ought to have been sent to account; and even if it was not error to order an account, whether the bill ought not to have been dismissed on the return of the commissioner’s report? After a diligent and anxious examination of the authorities and the reasons applying to the case, I am of opinion, that considerations both of private justice and public convenience, forbid courts of equity entertaining bills of this kind.
In the case of Smith v. Clay, reported in a note to Deloraine v. Browne, 3 Bro. C. C. 639. lord Camden says, “ A. court of equity, which is never active in relief against conscience, or public convenience, has always refused its aid to stale demands, where the party has slept upon his rights, and acquiesced for a great length of time. Nothing can call forth this court into activity, but conscience, good faith, and reasonable diligence; whore these are wanting, the court is passive, and does nothing. Laches and neglect are always discountenanced, and therefore, from the beginning of this jurisdiction, there was always a limitation to suits in this court. Expedid reipublicce ut sit finis litium, is a maxim that has prevailed in this court in all times, without the help of an act of parliament.” This case was decided in May 1767, and has ever since been considered a leading authority. This is shewn by the frequency with which it *172 is referred to, and always in terms of high commendation. Thus, in Pickering v. Ld. Stamford, 2 Ves. jr. 282. (and I might cite many others) the master of the rolls, referring to lord Camden’s opinion in Smith v. Clay, says, “ there a great deal of sound doctrine laid down, with regard to parties neglecting to prosecute their rights, in a manner which very much distinguishes the decrees of that noble lord.” Lord Camden further lays it down, “ that as often as parliament had limited the times of actions and remedies to a certain period in legal proceedings, the court of chancery adopted that rule, and applied it to similar cases in equity. For when the legislature had fixed the time at law, it would have been preposterous for equity (which, by its own proper authority, always maintained a limitation) to countenance laches, beyond the period that law had been confined to by parliament.” Thus, the statute of limitations is as good a plea in equity as at law; and will bar a bill for an account (for example) whenever it would be a bar to an action at law on the same account. It is laid down, however, in many cases, that the statute cannot be used as a bar in matters of trust; yet this expression, though general, is by no means to be understood as comprehending all cases of trust. Every deposit is a trust: every one who receives money to be paid to another, or to be applied to a particular purpose, to which he fails to apply it, is a trustee, and may be sued either at law, for money had and received, or in equity as a trustee for a breach of trust; Scott v. Surman, Willes Rep. 404, 5. But to these, and various other cases of direct trust, the statute applies, because they may be the subject of a suit at law as well as in equity. “ The trusts intended by courts of equity, not to be reached or affected by the statute of limitations, are” (as chancellor Kent well expresses it, in Kane v. Bloodgood, 7 Johns. Ch. Rep. 111.) “ those technical and .continuing trusts, which are not at all cognizable at law, but fall within the proper, peculiar and exclusive jurisdiction of equity.” But though to these the statute cannot be pleaded, it would be great mistake to conclude, that they are not affected by the presumptions, and public incon *173 venience, arising from length, of time. In Harmood v. Oglander, 6 Ves. 199. 217. the muster of the rolls says, that “ he should be very sorry to have it understood to be the rule of this court, that there is no limitation whatsoever to trust estates; and that, let the legal estate once get into a trustee, the cestui que trust may permit others to enjoy the property, and come to this court at any distance of time for an account.” It would be perfectly alarming. I do not consider executors and administrators such fiduciaries as come within the definition of strict technical trustees. Legacies, however, are thus far within the rule, that before the assent of the executor, there is no remedy for the recovery of them, but by bill in equity. The statute cannot be pleaded as a bar to them: yet equity, always averse to stale claims, will not “ be called into activity” in aid of legatees, after great length of time; especially, if the original parties are all dead, and their representatives allege their inability to furnish the accounts. It was said, that this rule did not apply to residuary legatees; but 1 think it applies to them especially ; for their claim always involves a settlement of the whole accounts of the administration. The case before us too, is still more complicated, for the bill demands, as mixed up with the executor’s accounts, the settlement of a long existing partnership, which had terminated forty years before the suit was brought. The cases against entertaining such antiquated claims, are numerous, la Lacon v. Briggs, 3 Atk. 105. there was a bill for an account; the statute was pleaded, but this was gotten over by the will of the defendant’s testator, rvhich, creating a trust for the payment of his debts, had revived this. Another objection to the account was, the expensiveness of taking it, after such a length of time (seventeen years had elapsed), and also, that the executor could have no means of checking the plaintiff’s account: Lord Ilardwicke said, “ I am of opinion, that if I should decree an account to be taken in this case, I should make one of the worst precedents, that a court of equity can make, for disturbing the peace of families.” In Bonney v. Ridgard, 1 Cox 145. A. devised his several estates to his wife *174 and three daughters, to be equally divided among them, and desired that the estates might be sold by his executors &c.; he left his wife and another executors; she alone proved the . gjle marrjecj again, and with her husband, sold the lanc^ in payment of a prior debt of his, to one having notice of the trust: the sale was in 1752; the youngest child came of age in 1764; the bill was filed by the children for an account, and to be let into their shares: the exact time of commencing the suit, is not stated, but the hearing was in 1784. Lord Kenyon considered the transaction one which would have been set aside, and relief given, if the bill had been filed in time; but upon the length of time which had elapsed, between the plaintiffs’ right accruing and their prosecuting it, he refused relief. He says, “ the testator died in 1748 ; the youngest child came of age in 1764; and though I admit the statute of limitations does not affect trusts, yet this , court from a principle of convenience, has borrowed an analogy from that statute. In this case, I think the length of time ought to bar; and if the authority did not say so, I would make the precedent, for this very case shews the good policy of the rule. Here, the many persons through whose hands this property has passed, have relied upon the undisturbed possession, and have laid out considerable sums of money in the improvement of it upon that idea. It would be too much, at this length of time, to give the plaintiffs the relief required, when the accounts cannot be taken. If these plaintiffs had made their claims when they all came of age, it would have been very different; but upon the whole, weighing the convenience with the inconvenience, I think it right to say, that the length of time is a bar in this case.” I cite this case rather for the general principles, than for the particular circumstances; for, though there was in it both fraud and breach of trust, it was decided principally on the ground of the former. The general ground of presumptions from length of time, is also very clearly taken by lord Ershine, in Hillary v. Waller, 12 Ves. 265, 6, 7. He considers the doctrine as founded in reason, the nature and character of man, and the result of human experience: *175 “it resolves itself (lie says) into this: that a man will naturally enjoy what belongs to him”—“ It has been said, you cannot presume, unless you believe. It is because there are no means of creating belief or disbelief, that such general presumptions are raised, upon subjects of which there is no record or written muniment. Therefore, upon the weakness and infirmity of all human tribunals, judging of matters of antiquity, instead of belief, which must be the foundation of the judgment upon a recent transaction, where the circumstances are incapable of forming any thing like belief, the legal presumption holds the place of particular and individual belief’^—“ Mankind, from the infirmity and necessity of their situation, must, for the preservation of their property and rights, have recourse to some general principle, to take the place of individual and specific belief; which can hold only as to matters within our own time.” Jones v. Turberville, 2 Ves. jr. 11. was the case of a bill filed to recover a legacy after forty years and more; and to rebut the presumption, the plaintiff proved that one legacy of ten guineas was not paid, and that an application had been made about thirteen years before, to one of the defendants, who admitted that she knew the legacy had not been paid: but the court dismissed the bill. Lord commissioner Eyre said,—“ It is a presumption of fact, in legal proceedings before juries, that claims the most solemnly established upon the face of them, will be presumed to be satisfied after a certain length of time. Courts of equity would do very ill by not adopting that rule. So essential is it to general justice, that though the presumption has often happened to be against the truth of the fact, yet it is better for the ends of general justice, that the presumption should be made, and favored, and not be easily rebutted, than to let in slight evidence of demands of this nature, from which infinite mischief and injustice might arise.” In the same case, Ashursl said,—“ All statutes of limitation, and presumptions analogous to them, are beneficial to the subject. If a man is liable after such a length of time, he is liable for interest also, and that trebles the amount of the original demand.” The case of Hercy v. *176 Dinwoody, 2 Ves. jr. 87. is also strong to shew the weight which is given in equity to the considerations of length of time, and public convenience. There, a bill was filed by creditors for an account; it was filed recently and answered; it remained in court with but few further proceedings, and thirty-three years after, the executors being dead, the bill was revived against their representatives and devisees: the master of the rolls refused the account, and dismissed the bill. It was contended there, that the matter being in suit, and the defendants called on to account, they could not discharge themselves by a payment, or settlement in pais; and therefore, that this case was not open to the presumption applicable to others. The master of the rolls admitted this, but said—“ For the reasons given in Deloraine v. Browne, 3 Bro. C. C. 633. independent of the question of satisfaction, but on account of the very neglect, and the mischief and disturbance that may arise to families, though the presumption of satisfaction is not so strong, yet the laches and neglect may be such as to make it matter of public policy, that the party guilty of it shall abide by the consequences.” Pickering v. Ld. Stamford, 2 Ves. jr. 272. 581. was a case very much canvassed; and, though under the very peculiar circumstances, the court did entertain the bill, there is no case in which we find the general law and practice of the court more clearly and strongly enforced. That was a case in which the testator made his executors trustees for charitable uses, directing them to lay out the residue of his personal estate (in certain townships) to and for such charitable uses, as they should think fit: the testator died in 1757; the acting executrix applied the interest and part of the principal of the residue, which was £ 7000. in the erection of a school, which was opened in 1765 ; part of the interest was applied in support of the school; and what was not so applied, or otherwise in execution of the will, was, from time to time, invested in stock. The bill was filed in 1792, by the representative of one of the next of kin, suggesting, that the greater part of the testator’s personal estate was lent on mortgage and other real securities, and that the bequest of *177 such part to charitable uses, was void by the statute of mortmain, and therefore resulted to the next of kin. Upon this ground the bill prayed an account &c. The time (thirty-five years) was strongly objected: the master of the rolls shewed, by various remarks, that he felt the full force of the objection: he said, that about the time the will was made, it was a question, about which great lawyers differed, whether such bequests as this were within the statute of mortmain, and that though it was now clearly settled to bo so, there was no ground for a lair presumption, that the plaintiffs being conusant of their rights, slept upon them, or meant to relinquish what he found himself obliged to say, upon the whole complexion of the case, they never knew they had a right to; Ibid. 585. He said, it was not desired that he should make the trustees pay back any money; that he would not have made them pay it back, if they had spent the whole; Ibid. 275. In another part of the opinion, Ibid. 584. he said, that it might have happened, that the trustees taking possession of the personal estate, and not aware of the law, might, in the course of so many years, have conducted themselves so as not to be able to prove, of what the personal estate consisted at the death of the testator. They might have kept such accounts, that it would have been impossible to determine, whether the plaintiffs could have made any specific demand upon any part of the personal estate. If so, I should have dismissed the bill. If the executors had lost the accounts, I should not have punished them; for executors are not bound to keep accounts thirty years.” Again, Ibid. 280. “If a party, having knowledge of his rights, will sit still, and without asserting them, permit persons to act as if they did not exist, to acquire interests, and consider themselves as owners of the property, to which the other will not assert his claim, there is no reason, that I know of, why every presumption should not arise, as in the case of a bond”—“ If this had been the case of a legacy, 1 should have been of opinion, that there was a bar, on the presumption of satisfaction.” Again, Ibid. 583. “ It is a very sensible rule, that parties shall not, by neglecting to bring forward *178 their demands, put others to a state of inconvenience, subjecting them to insuperable difficulties. Against such a bill undoubtedly, the court ought to set its face”—“ If, from the plaintiff’s lying by, it is impossible for the defendants to render the accounts he calls for, or it will subject them to great inconvenience, he must suffer; or the court will oppose, what I think the best ground, public convenience.” I will not incumber this opinion further with english cases, except simply to refer to Gregory v. Gregory, Cooper’s Ch. Ca. 201. where the bill was to set aside a purchase of land, made by a trustee of the céstui que trusts, who were his brother’s children, he being in possession, and holding for them, under their grandfather’s will, till they should come of age; and this purchase being made, as it would appear, soon after they had attained to full age: the master of the rolls said, it was a clear case for relief, if the parties had come in time; but they had delayed eighteen years, and their bill was dismissed.
The principles thus drawn from the english cases, are fully supported, if not advanced a step, by the spirit of our own decisions, and of our legislation also. The case of Bolling v. Bolling, 5 Munf. 334. Coleman v. Lyne's ex’or, 4 Rand. 454. Burwell's ex’or v. Anderson adm’r &c. 3 Leigh 348. shew this. In the last case, the president, delivering the opinion of the court, says—“ No one feels more strongly than I, the salutary influence upon the peace and repose of society, of the principle which forbids us to encourage stale claims, or to unravel long settled accounts. Nor is there any among all the subjects of controversy arising in courts of justice, to which this principle should be more liberally applied, than to that of executors’ accounts. No man’s estate would be safe, if no lapse of time could be permitted to close the door forever against inquiry. No man could die in peace, who had ever been an executor, if he knew that when he should be gone, and the memory of transactions lost, his representatives would be called to a new and rigorous scrutiny of matters buried in oblivion. No man would be executor under such circumstances; and thus, one of the charities of life, the preservation and administration of dead men’s *179 estates, would be committed altogether to careless officers of the law, instead of being discharged with fidelity and zeal by some friend of the deceased.” Tha.t our legislation breathes the same spirit, the several laws passed for the protection of fiduciaries, clearly shew. I will advert to but one; the statute of 1826, Supp. to Rev. Code, ch. 200. p. 260. limiting to ten years, actions, bills in equity, suits and motions, against executors, administrators, guardians &c.
Having taken this view of the law (much more tedious than I could have wished) I shall notice, as briefly as possible, the leading facts of the case before us. The bill was filed in 1818. The defendant, Thomas Chapman, was the natural son of Thomas Chapman the elder, and one of his legatees. The bill calls for a settlement of a partnership between Carr fy Chapman, which began in 1765, and was dissolved in 1782. Tt demands an account of the executor-ship of William Carr, which began in 1785, and ended by his death in 1790. It calls for an account from Thomas Chapman the younger, who, as executor of Carr, was also executor of Thomas Chapman the elder, and who, as an equal legatee with the plaintiffs under the will of their common father, was equally interested in any recovery that might be had from the estate of Carr. It was upon the ground of this interest in the executor, that the child and grandchildren of Carr were made defendants. The answer of Chapman offered no serious defence; ho was willing to account; he referred to the books, and was willing to produce them, or as many of them as were in his possession. The other defendants strenuously objected to any account either of the partnership, or of the executorship of their ancestor: they said, that these accounts were of transactions too stale to be countenanced by equity; that they were totally ignorant of the whole subject, and unable to furnish, any account ; and that the only person now living who has any knowledge of the business was Thomas Chapman the younger, whose interest it was to swell as much as possible the debt claimed to be due from the estate of Carr. I think that the chancellor ought upon the coming in of these an-. *180 swers, and the evidence then in the cause, to have refused * the account, and dismissed the bill. The bill was filed thirty-five years after the dissolution of the partnership; thirty-two J , , . , „ . ,, r J years alter the death or the elder Chapman; and twenty-years after the death of Carr. Thomas Chapman the younger was the executor of Carr: he had been long in the business, was an accomplished accountant, and was, equally with the other children, interested in his father’s estate. Could their interests have been in better hands ? Carr had got an order from the county court to settle his executorship, not long before his death; but nothing was done under it. In 1791, Thomas Chapman, his executor, had this order renewed; but the commissioners reported, that from the complication of the accounts, they could make no settlement. This, it will be remarked, was twenty-seven years before this bill was filed. In November 1792, in a friendly suit, in which Thomas Chapman the younger, the widow of T. Chapman the elder, then'again married, and her children, for whom she had sometime before been appointed guardian, were parties,—for a division of the estate of T. Chapman the elder,—an order of court was made appointing commissioners to make the division. They made a report of division, assigning to each his portion, and a final decree was entered accordingly. Of this decree no complaint has been made: the bill does not seek to disturb it, but seeks only for such residuary estate, as may arise from a settlement of the partnership and executorship. The exact ages of the children are not stated; but it seems a fair deduction from the record, that the plaintiff Charles Chapman, who is stated to have acquired the interests of the others, was of age in 1796, or thereabouts. By the will, the residuary portion of each was to be paid to him on his arrival at age. In 1796, then, this plaintiff was in interest and in duty bound to look after his portion. The records would inform him, that a fruitless attempt had been made to settle the executorship; and that his guardian had received his slaves and other estate. His brother and co-legatee, and the executor, could tell him better than any body else, whether *181 any thing and how much was to be expected from a settlement. Can we doubt, that he applied to him, and received the same information which the executor had before given to Ewell, who was his guardian, who, in that character, applied to him, and to whom he said, that there was nothing due from Carr’s estate ? Can we doubt, that he shewed the books to this brother, as he did to Ewell, and gave him free permission to examine, and take extracts from them, as he says, in his answer, that he was always ready to do, to any of the legatees ? and does not the information thus received, together with such light as he might get from the books, account, in the only rational way, for this plaintiff’s delay to sue, for twenty-one years after this ? Can we imagine any motive which should induce Thomas Chapman the younger to deceive his brother in this matter 1 none earthly; but, on the contrary, the strong and controlling motive of self interest, would prompt him, if there was any debt due from Carr’s estate, to disclose the fact, and to urge his brother to sue. If there had been any doubt felt as to the correctness of his information, that was the time for putting it to the test: the declaration that nothing was due, was a fair notice that a suit was the only mode of settlement left. Is it likely that twenty years after, when the witnesses were dead, some of the books lost, and the transactions forgotten, a commissioner could work out a more correct result, than Chapman could have come to, with the subject fresh, the whole familiar to him, and all the books before him 1 Chapman representing both estates, it was his right and his duty, as well as his interest, to retain in his hands as much money of Carr’s estate, as would discharge any debt, which it owed to the estate of T. Chapman the elder. Carr’s estate was ample; large sums of money belonging to it passed through his executor’s hands: is it conceivable, that he would not pay himself and his brothers'? Yet in 1806, he made a partial settlement and distribution of Carr’s estate, without making any charge of the kind, or retaining any part of the fund, for payment of such debt. In 1813, Carr’s representatives sued him for a farther settlement of that estate, and the *182 commissioner reported an account, shewing a balance against him of more than 20,000 dollars. Is it not singularly strange, that under such pressure, he should never have g0Ug}lt t0 avaq himself of this claim of Chapman’s estate on Carr’s ? When-we take these facts in corroboration of the great lapse of time, and add the circumstance, that the defendants are grandchildren of Carr, alleging their utter ignorance, and inability to'furnish an account, I think the conclusion clear, that no account should have been ordered. If any thing could strengthen this conclusion, it would be the report itself, taken under the order. In one of the cases in the former part of these remarks, it has been seen, that a strong ground of objection taken by the court to these stale transactions, is the expensiveness of the account. The one in the case before us was an immense work: the cost of it was about 1800 dollars; and I do not pretend to say, that the commissioner has overcharged, for it is said to have taken him two years pretty close labour.
I am of opinion that the decree must be reversed, and the bill dismissed.
Cabell, J. I am of the same opinion.
Brooke, J.
I shall not state all the minute facts in this record, but shall advert to those only that are essential to the decision of the case. The bills of the plaintiffs claim to have an account of the transactions of the partnership of Carr <Sf Chapman, which began in 1765, and closed in the year 1782, when the accounts of the partnership were settled by the parties, a large balance found due to Carr, and an equivalent amount of the outstanding debts assigned to him in payment of that balance. In December 1783, there was a further settlement, on which a balance was still found due to Carr. T. Chapman the elder died in 1785, having made his will, appointing Carr, his surviving partner, his executor, who administered his estate till his death in 1790. He appointed T. Chapman the younger his executor, with Simon Luttrell, who seems to have had little to do with *183 the administration, and died early, leaving T. Chapman the younger sole executor of Carr. So soon as Carr’s ex-eoutors took probat of his will, an order was obtained to settle the accounts of Carr’s administration of the estate of T. Chapman the elder, comprehending of course, the accounts of the partnership of Carr 6p Chapman. And in May 1792, the commissioners reported, that they could not settle them owing to their complexity. Who then were the parties competent to call for a settlement of these accounts? The widow of T. Chapman the elder, who had married a man in needy circumstances, and was the appointed guardian of her children. T. Chapman the younger also was entitled to a portion of his father’s estate, and was interested in this settlement; yet so well satisfied were all the parties (for we can infer nothing else) that this settlement was abandoned, not as impossible at that time, but as fruitless, until the commencement of this suit in 1818, twenty-six years after the ground lor this controversy was laid by the report of the commissioners appointed to settle these accounts in 1792, at which time many witnesses were alive who are now dead, and when too the whole of the books of the partnership were in existence. I do not think that there is any case, in which, after such a lapse of time, attended too by so many strong circumstances of gross negligence, and of abandonment of the claim, a court of equity has listened to such a claim. Let us examine some of these circumstances. In 1793, a friendly suit was brought for the assignment of dower and thirds to the widow of T. Chapman the elder, and for a division of his estate among his children. T. Chapman the younger was his executor, through Carr, the first executor, and the surviving partner of Carr Sp Chapman. How could the accounts of Carr, as executor of T. Chapman the elder, be settled by T. Chapman the younger, as executor of both, without bringing the accounts of the partnership under consideration ? Those interested in the estate of T. Chapman iho elder, if they believed there was any thing due his estate from the partnership, must have insisted on the settlement; and their failing to *184 insist on it, was a circumstance of gross negligence, or an abandonment of the pretension, that there was any thing due from the partnership to the estate of Chapman. And there is ground appearing in this record, for their thinking there was nothing due. T, Chapman the younger survived his co-executor Luttrell; and in 1806, settled his accounts of administration of Carr’s estate, on which a large balance was found against him, without his setting up any claim to a credit, on behalf of himself or the other parties interested in the estate of T. Chapman the elder. A suit was afterwards brought against him by Carr’s legatees; and it appeared, by a report made in that suit in 1817, that more than 20,000 dollars were due from him; yet, in that settlement of his accounts, no claim was made by him in behalf of himself and others interested in T. Chapman the elder’s estate. The present suit was brought in the following year, by the legatees of T. Chapman the elder, against T. Chapman the younger, their co-legatee ánd the executor of Carr, and against Carr’s legatees, and (the defendant T-Chapman, the executor, having been superseded as executor, pending the suit) against Carr’s administrator de bonis non. It is true, T. Chapman the elder left some infant children. When they came of age we know not; but his youngest must have been of age in 1806, he haying died in 1785, and they were united in interest with those of full age, and had guardians; nor is it reasonable to suppose, that they were totally ignorant of their rights, at least as long as from 1806 to 1818. It is strongly to be inferred that the decree of 1817, in which T Chapman the younger was found in debt to Carr’s estate more than 20,000 dollars, was the cause of this suit.
It was said, that the statute of limitations, though adopted by courts of equity, does not apply to a bill against executors or administrators; because they give bonds, to an action on which there is no limitation. That is so at law; but even there, the presumption of payment is admitted, upon lapse of time, against the bond; nor can I perceive how an executor or administrator can be considered to be more able, *185 after a great lapse of time, to settle his accounts, because he has given a bond. In the case before us, T. Chapman the executor, is, in that character, hardly more than a formal party: the surviving child and grandchildren of Carr are the substantial parties. Upon the property now in question, families have been provided for and reared; and the best uses of property in society will be defeated, if they are now to be deprived of it. In the case of Smith v. Clay, 3 Bro. C. C. 639. lord Camden has laid down the principle, on which courts of equity act in such cases: he says, “ A court of equity, which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept on his rights, and acquiesced for a great length of time. Nothing can call forth this court into activity, but conscience, good faith, and reasonable diligence; where these are wanting, the court is passive and does nothing.” On these principles courts of equity, though they have adopted, are not tied down by, the statutes of limitations. A shorter lapse of time accompanied with gross negligence, and acts of abandonment, by those having an interest, and competent to assert their rights, will bring then-case within the principles laid down by lord Camden. If the court saw, that it was called on to do injustice, it would not move, however strong, in point of original right, the claim might be.
It was also urged, that this is a case against a trustee. If a trust be created by the act of the parties, the possession of the trustee is the possession of cestui que trust, and no length of such possession will bar. But a trustee constituted by the law, as an executor or administrator, or a trustee by the decree of a court, does not stand in that relation: there is no confidence between the parties; their rights are adverse.
1 could pursue this subject farther, and if authorities were wanted, they might be found in abundance. I think the decree must be reversed, and the bill dismissed.
Decree reversed.