## JOHN MELLISH'S ESTATE.

It is an undoubted principle in equity, that, as between *cestui que trust* and trustee, in cases of direct trusts, no length of time is a bar. From the privity existing between them, the possession of the one is the possession of the other. But the trusts so protected are those technical and continuing trusts which fall within the proper and peculiar jurisdiction of equity. This doctrine does not apply to trusts arising by implication of law.

But, although direct, continued technical trusts, which are not cognisable at law, and proper only for the jurisdiction of equity, are not affected by the statute of limitations, nor by the doctrine of the presumption of payment or satisfaction; yet it does not follow that in such cases a Court of Equity will always interfere to grant relief. On the contrary, it has been the constant course of equity to discourage stale demands, and often to refuse their interference.  ·

Nothing can call a Court of Equity into action, but the concurrence of good faith and reasonable diligence; where these are wanting, the Court is passive, and does nothing. Laches and neglect are always discountenanced.

Where, in any particular case, peculiar circumstances exist, which account for and will excuse or justify the delay, the Court will not then refuse its aid because of mere lapse of time.

No precise rule can be laid down when a delay will be excused or justified; each case must depend upon its own peculiar circumstances.

A petition for a citation against an assignee to settle his account, or trustee, must be verified on oath or affirmation, in order to authorize the issuing of a citation. It is a ground for dismissing such an application, when no affidavit is attached. Such is the rule in relation to applications for a citation against an executor, administrator, or guardian, in the Orphans' Court.

*July* 15. THIS case arose on a petition filed in the Court of Common Pleas by one James Gibson, alleging that he was a creditor of one John Mellish, who made an assignment to Thomas Hulme, in 1820, of all his property, for the benefit of his creditors, and alleging that the said assignee had never filed any account of his trust, and praying for a citation in the usual form; but there was no affidavit alleging that the facts set forth were true.

Thomas Hulme filed his answer, and alleged many reasons why he should not be required now to file an account: one was that the petition was not sustained by an affidavit; another, and the main ground, was, that more than twenty years had rolled by since the execution of the assignment, and therefore the law presumed that the estate was fully settled.

The cause was argued by Mr. *Ingraham*, for the petitioner, and *Thomas I. Wharton*, for the respondent.

Mr. *Wharton* relied upon Ingraham *v.* Cox, ante, page 70, decided by this Court as conclusive; and cited Sechcrist *v.* Sechcrist, 1 Penna. R. 419; Foulk *v.* Brown, 2 Watts, 209; 2 Penna. R. 262.

Mr. *Ingraham* contended that the case of Ingraham *v.* Cox could be distinguished from the present; that it was decided on different principles, and therefore was not conclusive on the point.

The opinion of the Court was delivered by

KING, President.—This case comes before us on the petition of James Gibson, setting forth that, on the 23d day of June, 1820, John Mellish, then of this city, map-maker, made a general assignment of his estate and effects, for the benefit of his creditors, to Thomas Hulme; that this assignment was accepted by said Hulme, and was that day recorded according to law; that the said Hulme, immediately upon the acceptance of the said assignment, entered upon the duties of the trust thereof, and received of said assigned estate a large amount of property; that he has never settled any account as assignee, and that the petitioner is a creditor named in the assignment, and entitled to a distributive share of the estate conveyed in trust thereby. The petition concludes with the usual prayer for an account.

The respondent in his answer sets forth various reasons why he should not account; but that upon which he most depends, and which gives rise to the essential point involved in the case, is the length of time which has elapsed since this assignment was executed; being now upwards of thirty years. The petition assigns no reason for this extraordinary delay, either arising from the *nature of the trust,* the *manner* in which it has been *executed,* or the *circumstances* and *condition* of the *petitioner.* Nor has anything of this kind been interposed by way of replication to the defendant's answer. On the contrary, the case has been argued as exhibited by the petition and answer.

The question then presented by the pleadings is, whether the Court will entertain a proceeding against an assignee in trust for creditors, to compel the settlement of an account thirty years after the date of the assignment; and where the petition for the decree for such account states no fact or circumstance explaining the reason of such delay; and where the petitioner does not even think proper to present such explanations, by way of replication to the answer, after the respondent has actually urged this great lapse of time as a reason why he should not account.

To sustain this application, therefore, we must go the length of determining that mere lapse of time affords no answer to an application made by a creditor under a general assignment, seeking to

compel the assignee to settle an account. The argument of the learned counsel for the petition went fully to this extent.

It is an undoubted principle of equity, that, as between *cestui que trust* and trustee, in cases of *direct* trust, no length of time is a bar : Beckford *v.* Wade, 17 Vesey, 97; Hovendon *v.* Lord Annesley, 2 Sch. & Lef. 633; Chalmer *v.* Bradley, 1 Jacob & Walker, 67; Kane *v.* Bloodgood, 7 Johns. Ch. Rep. 90. For, from the privity existing between them, the possession of the one is the possession of the other. If the trustee does not perform his trust, his possession operates nothing as a bar, because his possession is according to his title. But the trusts so protected are those technical and continuing trusts which fall within the proper and peculiar jurisdiction of equity. This doctrine does not, however, apply to trusts arising by implication of law. "It is certainly true," says Sir William Grant, in Beckford *v.* Wade, "that no time bars a direct trust; but if it is meant to be asserted that a Court of Equity allows a man to make out a case of *constructive trust* at any distance of time after the facts and circumstances happened, out of which it arises, I am not aware that there is any ground for a doctrine so fatal to the security of property as that would be; so far from it, that not only in circumstances where the length of time would render it extremely difficult to ascertain the true state of the fact, but where the true state of the fact is easily ascertained, and where it is perfectly clear that relief would originally have been given upon the ground of constructive trust, it is refused to the party who, after long acquiescence, comes into a Court of Equity to seek relief."

But although, strictly speaking, direct, continued technical trusts, which are not cognisable at law, but fall within the proper and peculiar jurisdiction of equity, are not affected by the statute of limitations, nor by the ordinary doctrine of presumption of satisfaction from lapse of time; yet it does not follow that in all such cases equity will interfere, where a party has slept on his rights for a great length of time, being at the same time conusant of them, and capable of asserting them. On the contrary, it has been the constant course of Courts of Equity to discourage stale demands. Even in frauds, in which, if recent, there would have been no doubt, lapse of time has induced the Courts to refuse their interference : Atty. Genl. *v.* The Mayor of Exeter, 1 Jacobs, 443. It is because of the great public or private inconvenience that would follow from such intervention, that the Court refuses to act. The principle which regulates a Court of Equity in all this class of cases, is that expressed

by Lord Camden in Smith *v.* Clay, 3 Bro. Ch. Rep. 639 (note). "A Court of Equity," says he, "which is never active in relief against conscience or public convenience, has always refused aid to stale demands, where the party slept upon his rights, and acquiesced for a great length of time. Nothing can call this Court into *activity*, but the conscience, good faith, and reasonable diligence; where these are wanting, *the Court is passive, and does nothing.* Laches and neglect are always discountenanced, and therefore, from the beginning of the jurisdiction, there was always a limitation to suits in this Court." To what extent and under what circumstances this doctrine of non-intervention has been adopted and carried, and how far it embraces a case like the present, is best shown by a recurrence to some of the leading decisions on the subject. Huet *v.* Fletcher, 1 Atkyns, 467–8, arose on a bill for an account brought by a son forty years after the death of his father, against the executors of his mother, for an account of the personal estate of the father, which had come into her hands as his administrator. The bill was dismissed with costs, Lord Hardwicke considering that this was of the sort of bills that deserved the utmost discouragement from the Court. In Wood *v.* Briant, 2 Atkyns, 521, the same Chancellor refused to decree an account against an executor after more than twenty years subsequent to the death of the testator, though the executor and the residuary legatee who demanded the account were both living. Pearson *v.* Belcher, 4 Vesey, Jr. 628, was a bill filed on the part of several of the officers and seamen of a company of adventurers in a privateering expedition against the principal managers, praying for an account of the proceeds which had come into their hands from prizes captured by the company. The bill was dismissed by Lord Alvanley, upon the ground of the impolicy of entertaining the suit after so great a lapse of time. The case of Ex parte Heathfield, 8 Taunt. 403, resembles that before the Court in many of its principal features. Under an act for the relief of insolvent debtors, an assignee was appointed to the estate of an insolvent. After a succession of removals and appointments, in 1779 one M. was appointed assignee under a rule of the Common Pleas. It appeared that the assignee had obtained possession of the insolvent's estate and disposed of some parts of it, but that he afterwards died *without making distribution,* leaving N. his heir and personal representative. In 1818, forty years after the appointment of the assignee, the administrator of the insolvent applied for a rule against N. to show cause why a new assignee should not be appointed, and an account be taken of such part of the insolvent's

estate as had come to the hands of M. or N. But the Court of Common Pleas, on the sole ground of the unreasonable length of time which had been suffered to elapse since M.'s appointment, rejected the application.

The case of Chalmers v. Bradley, 1 Jacob & Walker, 62, although the plaintiff's bill in that case was not rejected absolutely, exemplifies the true principle on which equity acts when its aid is sought to unravel ancient accounts, even between trustee and *cestui que trust*. The bill was brought for an account against a trustee under a will, forty-five years after the testator's death, alleging the recent discovery of the facts out of which the plaintiff's equity arose. Sir Thomas Plumer, on the hearing, directed a special inquiry to ascertain whether the plaintiff had notice of these circumstances, reserving all further action on the bill until the coming in of the Master's report. "The reason," says he, "that I direct these inquiries is, that, though I am impressed with the impolicy of permitting stale demands to be brought forward; though I know that on the principles stated in Smith v. Clay, a Court of Equity is not to be called into action by those who are not vigilant in support of their rights, and am aware of the monstrous inconveniences that would result if at some period the door were not shut upon litigation; yet I fall in entirely with the opinion expressed by Lord Alvanley in Pickering v. Stamford. There the suit was commenced after a lapse of thirty-five years, *by persons who declared themselves ignorant of their rights*. Lord Alvanley, under the circumstances of that case, could not be sure that they were not ignorant; and therefore, stating strongly his opinion in favour of the general principle that a party ought to be barred by length of time, and lamenting that he could not in that instance follow it, he directed similar inquiries, stating at the same time, that if he were then to decide it, he would decide it against the plaintiffs, and that by the inquiries he did not decide one way or the other, and would afterwards consider whether there was sufficient equity in the bill." The cases of Hervey v. Dinwoody, 2 Ves. Jr. 87, Shipbrook v. Henchenbrook, 13 Vesey, 337, Brownell v. Brownell, 2 Brown's Ch. Rep. 62, are cases resting on analogous principles, as do the cases of Ellison v. Maffet, 1 Johns. Ch. Rep. 47, Executors of Arden v. Arden, Ib. 313, Raynor v. Pearsall, 3 Johns. Ch. Rep. 579, and Gest's Heirs v. Cattel's Heirs, 4 Dessau. 706.

It follows from what has been already said, that where in any particular case peculiar circumstances exist, excusing or justifying the delay, the Court will not refuse its aid because of lapse of time; Lop-

dell *v.* Creigh, 1 Bligh (N. S.), 255. It would be difficult, if not impracticable, and certainly not wise, to define what are the circumstances which will be deemed sufficient, in a Court of Equity, to justify or excuse protracted delay in seeking relief. Each case must depend on the exercise of a sound discretion, arising out of its particular circumstances. The cases of Pickering *v.* Stamford and Chalmers *v.* Bradley show that ignorance of rights or recent discovery of facts, out of which the plaintiff's equity arises, sufficiently accounts for a delay in asking a remedy, otherwise inexcusable. In Wedderburne *v.* Wedderburne, 4 M. & C. 52, the delay of the claim being attributable to the trustee not having given that information to his *cestui que trust* to which he was entitled, this was deemed sufficient to justify the supposed laches of the latter. Many other instances of such exceptions to the effect of laches, and lapse of time, in equity, might be enumerated, but, as has been said, they all would arrange themselves under this category: that whenever the circumstances of a given case, arising between trustee and *cestui que*, exhibit such reasons for apparent delay in the assertion of a claim by the latter, as satisfactorily accounts for the same to the Court exercising a sound discretion, such an explained delay will not affect a right otherwise perfect: Rayner *v.* Pearsall, 3 John. Ch. Rep. 579.

In the present case no attempt at explanation of the plaintiff's delay has been made, either in the original petition, or, as admissible in the practice of this Court, under the Act of Assembly regulating assignees in a replication to the defendant's answer, setting up this delay as a reason for not accounting. The case therefore presents to us the simple and unmixed proposition, whether this Court will entertain an application to compel an assignee in trust for creditors to file an account of his trust, as of course, on the application of a creditor, thirty years after the creation of the trust, although no part of the plaintiff's proceedings assigns any cause or reason for such a delay, and although the respondent interposes length of time, as an equitable bar to the plaintiff's demand for an account. And to such a proposition our answer must, on principle and precedent, be an unhesitating negative. If, however, the plaintiff can assign any sufficient reason for his apparent procrastination, we are disposed to permit him still to do so, according to our practice, by way of replication to the defendant's answer. If he avails himself of this permission, and presents his reasons for this delay, we will then consider their effect; and should we deem them sufficient if proved, we will inquire into their truth in fact, by the usual reference to a

Master, as was done in Pickering *v.* Stamford and Chalmers *v.* Bradley.

It is objected in the defendant's answer that the petition in this case is defective, because it is not supported by the oath or affirmation of the plaintiff. This objection we consider well taken. The 33d section of the "Act relating to assignees for the benefit of creditors, and other trustees," declares that the manner of obtaining the appearance of persons amenable to the jurisdiction of this Court in cases of trusts, and to compel obedience to our decrees and orders, shall be the same as is now by law vested in and provided for the several Orphans' Courts. The manner of proceedings in the Orphans' Courts is, by the 57th section of the "Act relating to Orphans' Courts," directed to be by petition in writing to the Court, of any person interested, setting forth facts necessary to give the Court jurisdiction; the specific nature of the complaint; and the relief desired, supported by oath or affirmation. The petition filed in this instance is not under oath, and consequently defective. But as this objection can, if sustained, only lead to renewed litigation, we are disposed to permit the plaintiff in this instance to amend his petition by making the required oath. If this is done, and a replication is filed by him in conformity with the principles expressed, on or before the first day of the next term, the cause may be again presented for further direction. Otherwise we will order the proceedings to be dismissed, with costs.