Sedgwick, J.
The learned counsel for defendants maintained, as one of the defenses, that the southern boundary of the lands conveyed by the corporation to Walker was, by the parties, practically located on the soil so as to exclude from lot No. 194, and include in the lands of the city, the whole of the premises in question.
“lam forced to think, that the mere fixing of the boundary alluded to would not have the result claimed.
“The deed did not describe the lot by measurements from monuments. It did not give any quantity. An inspection of the map referred to gives neither. The deed conveyed the lot No. 194 on the map, describing it as bounded on the north and on the south by two streets, respectively, of sixty feet in breadth, between the lot and other lots, numbered on the map. The fee conveyed went to the center of the streets, because they were boundaries, and the words of the deed did not specifically exclude the soil of the street. If we suppose, then, that the parties proceeded to lay the boundary on the south, that boundary must have been on the northern line of what, by the deed and the map, was deemed a street, and, by force of that fact, the street became the boundary, and, therefore, the owner of the lot owned one-half,of the boundary or street. Merely *315 bounding actually on a street would follow the description of the deed. If the deed had described this line otherwise than by reference to the street, .and if, in fact, that line were along a street, the fee would go to the center line of the street (Sizer v. Devereux, 16 Barb. 160; Hammond v. McLachlan, 1 Sandf. 323 ; Herring v. Fisher, Id. 344). It is well to say here, that the deficiency of land on the Goerck map as compared with the Randall map does not affect this case. The deed conveyed lot 194, and the evidence shows that.that lot had a definite situs, which would not be changed by the error alluded to.
“ I am, however, of opinion that, excepting the piece called the gore, the defendants have title by adverse possession, and that they have title to the gore by the equivalent of a voluntary conveyance from Alpheus Sherman.
“The claim of the plaintiffs rests upon the description of the deed referred to. Every other fact of the case (and the most important of these are acts in which the parties had mutual relations), testifies that the disputed land was owned by the city. There is no proof that, from 1803, Walker or his assigns made a claim to that land in any way.
“ It is denied that adverse possession could be commenced, because the city, as grantor, never gave the grantee possession. The counsel for defendants urged, that the proof showed that the city had, in fact, given to the grantee, Walker, possession of the land in dispute. To support this, he points out that the city’s deed to Walker describes the land as in Ms actual possession now being,’ and argues that this corresponds with the legal presumptions that the obligation of the grantor to give possession was performed, and that the usual and ordinary consequence of a grant followed. But presumptions and admissions, for it is *316 not claimed that there is an estoppel, cannot be relied on to the exclusion of decisive evidence as to the matters to which they relate. The fact was, as I think the evidence abundantly shows, that neither party thought, of giving or taking possession of the land in dispute, because neither believed that the grantee was entitled to it. This did not flow from the idea that actual possession could not be had, inasmuch as the public were-to have, forthwith, the actual use for the purpose of a highway. If this had been the fact, and the public were, or were forthwith to be, in use of the street, it would be a proper conclusion that the giving possession up to the street operated as to the street itself. But, under the deed, Walker remained in actual possession of land comprised between the northern lines, of the two streets named as boundaries. If there were purpose to give possession between the center lines of these streets, there was nothing to prevent. If the-right were recognized, Walker would not have been placed in possession of the whole of the north street.. This giving possession, temporarily, as it turned out, to. the whole of this street, was a part of a systemizecl plan, necessarily involved the exclusion of Walker from any occupation of the street to the south. I conclude, on this point, that the city never put Walker in actual possession of the locus in quo. For reasons of a like kind it should be held that neither Walker nor any of his assigns conveyed the piece back to the city. If Walker had been put in possession of the land in dispute, and had thereafter been ousted from it, or had conveyed it back and left it, the evidence is so full as to the actual occurrences, it is impossible to doubt that these facts would appear.
“ It is urged that, as the grantor remained in possession after the conveyance, it became tenant at will of the grantee, and that, so long as it remained such, and before it delivered possession and re-entered under *317 its own claim, it was disenabled from beginning adverse possession.
“It is evident, that, while the grantor may be such u tenant, he does not hold the ordinary relation of a tenant-who takes a term from or agrees to pay rent to his grantee. Up to that point his rights are limited only by the obligation of his deed. He has done no .act, like receiving possession from his landlord, which binds him to allegiance or fidelity. The grantor, remaining in possession, is not entitled to notice to quit before the grantee has the right to bring ejectment. -Of such a tenant, Chief Justice Thompson, delivering the opinion in Jackson v. Aldrich (13 Johns. 106), said, ‘ There was certainly no relation of landlord and tenant created by any express agreement, and to presume such relation from the naked fact that the defendant continued in possession, would be carrying the -doctrine of presumption beyond what, in my judgment, the rules of the law will go.’
“In another like case (Jackson v. Burton, 1 Wend. 341), the court approved Jackson v. Aldrich, and said it held, ‘ that, even as between Garrison (the grantor) and the "defendant, the relation of landlord and tenant did not exist, so as to entitle him to notice to quit, and that he was at most but a tenant at will;’ and the same case held, ‘ that nothing but a clear and unequivocal and notorious disclaimer of the title of the landlord could render such a tenant’s possession, .however long continued, adverse.’
“It could not be the force of the deed alone that would prevent the grantor in possession making an -effective claim of adverse possession, if it be admitted that he could) make such a claim after' rendering possession, for that would not vary or diminish the force of the deed.
“If he were in the position of a person who had received the possession from another, other rules would *318 apply (Smith v. Babcock, 36 N. Y. 167, and the cases-there cited; Burhans v. Van Zandt, 7 Barb. 91-100; Jackson v. Spear, 7 Wend. 401; Kane v. Bloodgood, 7 Johns. Ch. 90 ; Judge Nelson’s opinion in Zeller v. Eckert, 4 How. U. S. 289); but, not having done that or-an equivalent act, there is no reason of policy or in the-nature of things, why a person, who has apparently executed a deed covering the premises, should not gain a title by adverse possession, which must last so long-that the presumption from the passage of time will, in its conclusions agpinst all the world, include the case of there being some sufficient réason why it would be impolitic or unjust to determine- the validity of the reasons an apparent grantor might have for denying the-deed. If the grantee brought ejectment at the time, the grantor might plead non est factvm, or have the deed reformed in equity. And after the lapse of the-statutory period the validity-of the actual claim on which adverse possession begins, is never a question. In fact, it is often assumed to begin in a tort, and that before it there was an owner who was wronged, and the law refuses to ascertain the quality of the act.
“ I find, as the facts of the case, that Walker was put in actual possession of so much of lot No. 194 as was north of the old street to the south. This fact implies that, when the deed of lot 194 was given, and. no further thing was done, the city claimed all south of that north line as its own. Especially is this to be inferred from the fact that they put him in possession, of all the street to the north. About twenty days after the deed was delivered to Walker, the city made its lease to Anthony Smith for the term of twenty years of lot 193, giving to him actual possession up to the line of the actual possession given to Walker.
“It may, perhaps, be said that these facts do not show that this claim that affected the northern part of lot 193 was of a fee, but that they show only that the *319 claim was to hold that part subject to its being taken thereafter as a street, and was a claim to hold only temporarily until that street was opened.
“This is answered by the rule cited by counsel for defendants, that a subsequent act will explain a preceding entry ’ (Smith v. Burtis, 9 Johns. 174-182).
“ The prior act may be characterized by the inference to be drawn from subsequent acts.
“ The subsequent acts referred to in this case are those of the plaintiff’s ancestor, Mr. .Sherman. He remained in actual possession from the time when lot ¡No. 194 was conveyed to him by Jane Ackerman, about 1820, until 1835, when he conveyed to ¡Davis. During this time he was confronted by the possession of the city, through its tenants, of the 'land in dispute, and which the deed, as now construed, gave to him in fee.
. “ Proceedings for the opening of Seventy-ninth street, from Fifth*avenue to the East river, were begun some time before June 14, 1827, because a report of the commissioners was filed on that day. To these proceedings Mr. Sherman was a party, and they, and the map connected with them, were notice to him so far as they affected his property. By the map it appeared that the city claimed that his land extended down so as to include, on the south, only the soil of which he had been in possession, and that it was the owner of the soil to the south of that possession.
“This was specific notice that it did not claim to hold the land in dispute temporarily, and until the sixty - feet street could be opened ; for, necessarily, when Seventy-ninth street was opened, any idea of using soil of the sixty-feet street was abandoned.
“Mr. Sherman was an involuntary party to these proceedings, as far as they concerned the land taken for the street, and a voluntary party as to the gore that has been mentioned.
“Of the section of the statute under which that *320 gore was taken, it was said in Embury v. Conner (3 N. Y. 511), that taking the award for a piece similarly situated—and in the present case it was shown that Mr. Sherman took the award for the gore—was a consent to the proceedings. ‘ These proceedings being taken with the consent of the owners, and duly confirmed, by the court, aqd the damages paid pursuant to the statute, operate as a conveyance of the land and vest the title in the corporation.’ And the court had before said: ‘But it is insisted, that as the enactment is only held to be void on the ground that it takes private property for private uses against the owners’ consent, if the consent be given, all objection on the ground of unconstitutionality is removed.
“ The decisions to which I have referred proceed upon that principle, and Mr. Justice Bronson, in Taylor v. Porter, in terms conceded that the objection has no application when the owner consents. If we read the statute with a proviso that the owner consents, and I think we should, that consent removes all obstacles, and lets the statute in to operate the same as if it had in terms contained the condition.
“The transaction, as it affects the gore, was of a voluntary character. The offer on the part of the commissioners had for its terms the terms of the section 179: ‘ It shall be lawful for the commissioners * * in all cases when part of any lot or lots shall be required for any of the aforesaid purposes, leaving a residue of such lot or lots * * belonging to the same owner or owners, or parties in interest to whom the said part thereof so required for such purpose shall belong, and they, the said commissioners, shall think it expedient and proper so to do, to include and comprise in their said estimate and assessments the whole or any part of such residue of such lot or lots * * along with the part of the same so required for the said purpose of the said intended *321 operation and improvement, in like manner as if the said residue or the part thereof so included * * was required, &c.’
“The report of the commissioners stated that a certain piece of land, owned by Sherman in fee, and which it is conceded, in this case, was part of the land possessed by Sherman as No. 194, was required for the opening, and proceeds to state that such piece ‘ is part only of a certain piece or parcel of land of, in and to the whole of which the said Alpheus Sherman is seized in fee, subject to the rent hereinafter mentioned, and that we, the said commissioners, do deem it expedient to include and comprise in this, our estimate and assessment, so much of the residue of the said piece or parcel of land so belonging in fee to the said Alpheus Sherman, as is next hereinafter immediately described, Ac.’ The piece was described as a triangular parcel of land, and the southernmost boundary was ‘ southeasterly along land now or lately belonging to the mayor, aldermen and commonalty of the city of New York.’ The map of the proceedings made it clear beyond doubt, that the commissioners proposed to take all of the lot to the south on the Third avenue, and it was apparent that the city claimed to own absolutely the land up to the southern boundary , of the gore. This southern line was but five hundred and ninety-one feet and six inches, but, if it were protracted in a straight line to the Fourth avenue, the whole would be the southern line of Sherman’s actual possession.
‘ ‘ This southern line had given the course to a fence existing in 1810, and which continued to exist to 1821, when Mr. Ludlam surveyed the ground, according to the possession, and found this fence. Upon this survey the Doughty and Ludlam map was made. This map was admissible, as showing, in connection with Mr. Ludlam’s oral evidence, what the possession was—but, beyond this, two leases, letting lot 195 on *322 May 1, 1823, and lot No. 152 on March 15, 1824, brought the map specifically to his (Mr. Sherman’s) attention. The commissioners’ proceedings did not estop Mr. Sherman or his grantees from showing the true title to the land south of the gore. They, however, form admissions as to the possession and title, and are direct evidence of the fact of the cit.y’s claim and possession as owner in fee. The city had made the .same claim by the Doughty and Ludlam map, and by the facts it perpetuated. One peculiarity of this map is that it applied the lines of possession with reference to the Goerck map and the monuments laid down soon after 1807 for the opening of Seventy-ninth and other like streets. Its assertions are made of facts as existing from the time of the Goerck map, which are brought to Mr. Sherman’s knowledge, and in accordance with which he acts, as the facts already stated show, and as again clearly appears by the conveyance of the city to him in 1835, recorded on November 20 of that year.
“By that conveyance he takes from the city a piece of land, paying $1,848, which the description bounds on the south by a piece of land belonging to the said party of the second part (being a portion of a certain lot of the common lands formerly belonging to the said parties of the first part, and known as number 194).’ On the east it was bounded by Third avenue one hundred and seventeen feet and seven inches, and on the west by the Fourth avenue one hundred feet and one inch. These eastern and western measurements included the old street to the north. The deed is evidence that the city claimed to own in fee the soil of the whole of the old street, and that Sherman recognized the claim, buying the land without protestation or reciting that it was in settlement of any disputed claims. The relation of this old street on the north to the lot *323 was the same as that of the old street on the south. They would both pass by the same construction of the deed. The interests of the parties were of the same nature. What one would claim or yield on the north side would be claimed or yielded on the south side. At the least, at rhe time of opening Seventy-ninth street, in 1827, the city claimed to own the fee, and Sherman assented to it on the south, and the deed to him of 1835 proves that this was well considered, however mistaken. But in going back to the origin of the city’s claim, the manner of depicting the streets on the Groerck map, shows, in connection with the possessions taken ¿under it, that the city claim was from the first that they were in possession of the old street on the south as owners in fee. This is the root from which grew the subsequent admissions and acts of the owners of lot 194
■ “ This possession of the city was hostile, inasmuch as it was repugnant with the operation of the deed as conveying a fep of the streets, and none the less hostile that the grantees recognized the validity of the city’s possession. The adverse claim was notorious, and was continuous for more than twenty years.
“ It is argued on behalf of the plaintiffs the commutation of the quit-rent and the release of the city worked an estoppel, but there seems no reason to believe that the terms of their lease, or the fact of commutation, referred at all to lot 194, as affected by a claim to the land now in dispute.
“ It is further argued that the city, inputting its tenant, Anthony Smith, into possession by a lease of lot Ho. 193, as it appeared on the map of common lands, did not make any other claim than would appear on the face of the lease and the map. I think this would be correct, if the city only made the lease, and the tenant went into possession of more land than *324 the lease called for ; but, on the facts, I am of opinion that, outside of the lease, the city, as a fact, designated the land in dispute as a part of lot No. 193, and placed Anthony Smith in possession of it. This inference is drawn from the whole history of the case. The act and claim of the tenant were the city’s act and claim, and continued, through its successive tenants, . to 1852, when the tenant Willett ceased to occupy. It is to be noted that the lease under which the city’s tenant, John Eobinson, entered, referred specifically to No. 193 as it appeared on the map of the common lands made by Goerck in 1796, and resurveyed by Doughty & Ludlam in 1822. Although this lease may not have been recorded, the act of tenant in taking possession, up to the time of the possession under the grant of lot No. 194, was open to the world, indeed, in the very presence of Mr. Sherman, and was of unmistakable import; and there is no room for believing that the tenant made a claim for himself or otherwise than under and for his landlord.
“ It is also denied that the city, as a corporation, with special powers conferred and limited by statute, had or has the power to acquire title to any lands not needed for corporate purposes, or has the faculty of appointing an agent to take adverse possession. I think it has the power to take adverse possession, but do not enlarge upon the abstract question of law involved in the proposition, for the reason that the view I have already expressed necessarily implies that the city’s adverse possession was, or may have been, in protection of its undoubted power to hold the common lands.
“ It is further urged that the covenant of warranty in the grant to Walker prevents or estops the grantor from beginning an adverse possession or from acquiring any title by adverse possession which will not ac *325 crue to the benefit of the grantee. The learned counsel supports the proposition by the citation of House v. McCormick (57 N. Y. 310-320) and Wilklow v. Lane (37 Barb. 244-249). There is no need of examining at length the rule by which a grantor with warranty is estopped from questioning the title he conveys, or by which an estate, subsequently acquired by him, inures to the benefit of his grantee. In House v. McCormick (supra), the ordinary rule was applied to a case where the defendant did not claim a title by adverse possession. It was the simple case of conveying with warranty a fee, with no breach of that covenant, until a claim of title by the covenantor under a deed subsequent, and possession under that deed for a period of short twenty years. The important part of the decision was that the deed with warranty purported to convey the whole of the fee absolutely, and not a fee subject to be opened to let in other remaindermen, from one of whom the defendant gained his title subsequently.
" Wilklow v. Lane (37 Barb. 244) did refer to a case like the present to a certain extent. The court said, in its opinion, 1 John W. Carpenter, being the plaintiff’s grantor, by full covenant warranty deed, could not originate a possession adverse to the title under his deed. His deed covered not only the title and interest which he had at the date of the.deed, but also any title or interest which he might subsequently acquire.’
"The cases cited from the reports of the State to support this proposition were as follows: Jackson v. Reynolds (1 Caines Cas. 444). The court based its opinion upon the fact that the relation between the parties was that of landlord and tenant. It said, Reynolds has, by his admissions, recognized Low as his landlord ; he cannot, therefor, be admitted to dispute his title. The court did not deny the power of a tenant, under all circumstances, to begin adverse pos *326 session, for in Brandter v. Marshal], decided at the same term (1 Caines, 394-402) it said, in relation to a tenant holding over after the lease, ‘ There can then be no adverse possession, for until 1774 Joseph Marshall did not set up any title adverse to that of Pitch, and since that time twenty years, deducting the period of the British war, have not elapsed.’
“Jackson n. Seaman (3 Johns. 498) has the same bearing as Jackson v. Reynolds. Jackson v. Burton (1 Wend. 341) has been already stated, and does not support the proposition of Wilklow v. Lane. None of the numerous propositions of Bank of Utica v. Mersereau (3 Barb. 528) decide the point. So far as the question of adverse possession was considered, it was in reference to a party who had gone into possession of land as tenant of another, acknowledging his title. In a case (Kent v. Harcourt, 33 Barb. 491) not cited in Wilklow v. Lane, the court said (p. 497), in reference, apparently, to a grant with warranty: ‘ But if the grantee enters under the conveyance, and the title he acquires from the grantor is good, so that he cannot be divested of it except by his own act,-misfortune or neglect, the doctrine of estoppel, upon which the rule is founded, will no more apply to prevent the grantor acquiring title by adverse possession, commenced subsequent to his conveyance and surrender of possession, than it would to prevent his taking a conveyance from his grantee,’ citing Despard v. Walbridge (15 N. Y. 374). Kent v. Harcourt has approved Jackson Burton, in which it was held that a grantor might, without surrendering possession, commence adverse possession by a notorious and equivocal disclaimer of title.
“ Wilklow v. Lane is not very explicit. If a grantor with warranty cannot originate an adverse possession, necessarily, under an attempt to originate one, no title at all can be acquired which would inure to the grantee’s benefit; or, in other words, if a title *327 has been made by adverse "possession, then adverse possession must have begun. There is no doubt, that it is very difficult to fully state the principles that apply to a warranty, as a personal covenant, as an estoppel, or as conveying a subsequently acquired title.
“If, on the evidence in this case, I could find that possession of the disputed land had ever been delivered, there would be no difficulty in concluding that an adverse title had been subsequently consummated by the adverse possession (Kent v. Harcourt, supra; Cramer v. Benton, 4 Lans. 291; Stearns v. Hendersass, 9 Cush. 497). But I have found to the contrary, and there seems to be no essential difference between the two cases.
“ The city owned the land in fee. Conveyance was made with warranty. The city gave possession in part, excluding, the grantee from the remainder, which is the land in dispute. Assume, as we have decided, that, as against the grant without a warranty, the city can begin an adverse possession. That is a contradiction or disregard of the party’s own deed, which the statute recognizes as the foundation of a title. In this special case, it is repugnant to the deed only as to its relation to a part of the premises. It is evident that a case might be that would prevent the grantee from succeeding in an ejectment against the grantor. A very slight change of the words of the deed, reformed in equity according to the intention of the parties, would prevent an ejectment. An adverse possession comprehends a notice to the person claiming to be owner to bring ejectment. If a grant or bargain, and sale or feoffment can, in this way, be opposed successfully, why should a covenant, that but protects and attends the title, have greater force. The deed conveys the title. If, by presumption or the policy of the statuté, the deed falls, its covenants must go with it. *328 If a bill in equity had been filed, to reform the deed by bounding the property, not by the street, but by the side of the street, it would be no defense that the deed contained a covenant of warranty, that estopped the grantor from denying the grantee’s title to one-half of the soil of the street. Another view illustrates the immateriality of the covenant under circumstances like those here. Suppose, upon the city refusing to give full possession to the grantee, what would have been his remedy for the purpose of getting possession ? It would have been an action of ejectment, in which the plaintiff’s title would have been proved by the granting part of the deed, apart from the covenant. That covenant would not have re-enforced any defect in the deed, as a conveyance of the land. Of course, if adverse possession, continued for twenty years, does not prevail over the deed as such, there would. be something as to which the covenant might -operate, but I am of opinion that it does.
“I do not see that the giving of possession and reentering is significant as to the operation of adverse possession against a warranty. There is no doubt, that, as evidence, it is very significant of the adverse claim made. If the covenant is to operate as a transfer of the title by adverse possession, why should it not so operate if possession has once been given? In! every other mode of subsequently acquiring title the transfer is made, though possession has been once given. Title by adverse possession necessarily implies that a title has been competently acquired through one or another of the methods of transferring title recognized by law, and which, if relied on by a warrantor, who had not gained title by adverse possession, would inure to the benefit of the covenantee. But the policy of the law forbids an examination of any particular claim, from its conclusive presumption that there has been *329 some unquestionable claim, which, but for the lapse of time, could have been upheld.
“Ho allusion, as yet, has been made to the, defense that the lot 194, by the terms of the deed, did not extend on the east beyond the post road indicated on the Goerck map. I am of the opinion that on the mere terms of the deed, with the reference to the map, the land conveyed went no further than the road on the map, and that the deed did not convey to the road, that was afterwards opened, farther to the east, and that became Third avenue. They were two different roads, in fact, and the deed and map did not, and did not intend, to refer to the latter. It results from this, that the paper title of the plaintiff, as made by the conveyance to Walker, of lot Ho. 194, ceases at a point in the southern line of Walker’s possession, as we have already described it—three hundred and forty-seven feet west of Third avenue, that point being on the center line of the old post road. But the facts were substantially, as existed in the case of the land to the south, that have been reviewed. Walker and his assigns went into actual and adverse possession of the land, up to the new post road, claiming to own in fee, and title by adverse possession has been perfected. This possession and claim, however, it should be repeated, did not extend to any part of the land in dispute, but as to that the city remained in possession adversely to the whole world beside.
“Before closing, it is proper to thank the learned counsel on both sides for the aid that has been given by their clear and comprehensive briefs and oral arguments.
“I have received proposed findings from plaintiff’s counsel, but without passing upon them at present will return them to counsel, that they may make any other requests that are called for by the views expressed in this opinion, and that the defendants’ counsel may *330 present their requests, which have not been handed to me. I would prefer to pass upon both at one time.
T. Mitchell Tyng,* attorney, and Thomas H. Hubbard, of counsel, for appellants.
Townsend & Mahan, attorney for respondent Kane.
Wm. C. Whitney, corporation counsel, attorney for respondent Mayor, &c.; Francis Lynde Stetson, of counsel.
“Judgment for defendants, with costs.”
From the judgment entered upon the finding of the court, plaintiffs appeal.
Per Curiam.
The judgment should be affirmed, with costs, on the opinion delivered by the learned judge below.